12 Kan. App. 2d 44 (1987)
734 P.2d 1195
In the Interest of J.G. and J.G., each a child under 18 years of age.
No. 59,388
Court of Appeals of Kansas.
Opinion filed March 26, 1987.
James R. Borth, of Olathe, for the appellant.
Rebecca D. Brock, assistant district attorney, Dennis W. Moore, district attorney, and Robert T. Stephan, attorney general, for the appellee.
Before REES, P.J., BRISCOE, J., and C. FRED LORENTZ, District Judge, assigned.
Petition for review denied 241 Kan. 838 (1987).
BRISCOE, J.:
The natural mother appeals the district court's termination of her parental rights, raising two issues. She contends the district court committed reversible error in failing to require the preparation of a reintegration plan pursuant to K.S.A. *45 38-1565. She also contends the district court's termination order failed to comply with K.S.A. 38-1583 because it was not supported by clear and convincing evidence that she was unfit by reason of conduct or condition, and that the conduct or condition was unlikely to change in the foreseeable future. We find no error.
The children who are the subject of this appeal were born March 19, 1984, and June 2, 1985. Their parentage is unclear. The mother claimed her stepmother's uncle fathered the older child and that the infant was conceived following a rape. The mother was married in April 1984, but she denied that her husband, from whom she had since separated, was the father of either child. During the course of the severance hearing, a boyfriend testified he could be the father of the infant. The mother and her husband were present at the severance hearing and represented by counsel, as was the boyfriend. The putative father of the older child also appeared at the hearing and, under oath, denied paternity and relinquished any claim to the child.
When the State filed the child in need of care petition on November 1, 1985, it also included a request that the court terminate parental rights. The petition and accompanying affidavit set forth lengthy allegations of ongoing physical and medical neglect. Although the factual background of this case is painful to relate, we must do so in order to address the mother's contentions that the termination of her parental rights was procedurally premature and also unsupported by clear and convincing evidence.
SRS first had contact with the mother in July 1985, following a referral from the State of Nebraska. This involvement included several visits and information on nutritional and medical services available through the health department, as well as resources available through a family support worker. Several months later, on Friday, October 18, 1985, the mother telephoned SRS and informed the social worker that her landlady had told her someone from SRS had been calling and asking questions about the children. The social worker informed her that no one from SRS had been in contact with anyone regarding the children. Later that day, however, SRS did receive a report that the children were left alone for extended periods of time and that the dwelling they were living in had no running water.
*46 On October 21, 1985, an adult services worker visited the mother's landlady and, on October 25, the mother contacted SRS and told an emergency assistance worker that she wanted her children placed in foster care or day care. On October 28, she called SRS and informed the social worker that she wanted to place the children in foster care or surrender them for adoption. She phoned SRS approximately one hour later, however, and informed the social worker that she had made arrangements for friends to care for the children.
The social worker and adult services worker arranged a meeting with the mother and on October 29 met with her and her two children at the mother's home. The mother, holding the infant, met the social workers outside; neither the mother nor the infant was wearing a coat or shoes although it was a very cold, wet day. The social worker described the dwelling as a small cabin with one main room. The walls throughout the cabin were falling apart. The floor was dirty and covered with cigarette butts, loose change, and bits of food. There was one mattress, a porta-crib, and a playpen. The mother indicated that she lived alone with the girls; the infant slept in the crib and the older child on the mattress with the mother. The cabin had no running water. The mother used a Bunsen burner to prepare food. Two open space heaters were their only source of heat.
The social worker, approaching the infant in her crib, detected a distinct odor of urine. It was apparent the infant had been lying in a diaper filled with feces for some time. Dried excrement was caked from the back of the infant's legs up to her back. When the mother changed the diaper, the social worker noted some type of clear discharge from the infant's vaginal area. The mother indicated both children had suffered from diaper rash since the previous July when they came to Kansas from Nebraska.
The social worker informed the mother that her housing was not appropriate and that the children needed immediate medical treatment. No attempt was made to remove the children at that time.
After the October 29 visit, the social worker contacted a health nurse because she was especially concerned about the children's medical needs. The social worker and public health nurse arranged *47 an unannounced home visit for the next morning. The social worker contacted the police department and requested that an officer accompany them. The next day the police officer, the nurse, and the social worker arrived at approximately 10:30 a.m. The mother answered the door and called behind her to a boyfriend to get dressed; they had just awakened. The police officer was refused entrance; however, the mother permitted the social worker and nurse to enter. The inside of the cabin had deteriorated substantially from the previous day. The floor was covered with pots and pans; the mother kicked them aside to allow the social worker and nurse to enter. The social worker noted a used sanitary pad and a diaper filled with urine and feces on the floor. The older child, who was eating from a box of cereal, turned the box upside down and proceeded to eat the cereal off the floor. The mother stated she usually gave the older child a box of cereal and crackers and told her to "go play."
The nurse, who had first had contact with the mother in July 1984 when the mother sought treatment for herpes virus, described the dwelling as approximately 16 feet by 16 feet with no running water and with heat provided by two space heaters. All the windows were broken and stuffed with paper. She noted that a partition divided the kitchen area from a sleeping area. The floor was littered with cigarette butts, trash, and old food that was dried to the carpet. She saw roaches in the bed, in the baby's crib, and on the baby. During the visit, several roaches fell out of loose ceiling tiles onto the nurse's hair.
The nurse observed that the crib was actually a "porta-crib," a smaller-sized crib with a mattress elevated to within eight inches of the top railing. Such a crib is inappropriate for a child of this infant's age because, if she were to turn over, she could fall out. The crib mattress was bare plastic; there were three puddles of yellow liquid on the mattress and a urine-soaked diaper near the infant's head. Also in the crib was a bottle containing solidified formula.
The nurse examined both children. The older child had "very thick, brown crusty matter" behind both ears and in her neckfold. Her throat was reddened, the left tonsil was enlarged, and her left eardrum was completely occluded by wax. The bottoms of both feet were peeling, but the nurse detected no discharge or *48 signs of infection. On her labia majora, the large lip to the opening of the vagina, the nurse noticed a hard, reddened elevation of the skin, something she had never seen before. The doctor who later examined this child told the nurse the elevation on the labia majora was either a callus or scar tissue. She could not see a hymenal membrane.
The nurse examined the infant and compared her height, weight, and head measurements with the height, weight, and head measurements which are normal for a baby girl of her age. Through this comparison, the nurse noted a variance between this child's growth and that of a normal child. This infant's head was growing faster than the rest of her body. She was growing in height, but not gaining sufficient weight for her height. As a result of these comparisons, the nurse became very concerned that this infant was not receiving proper nutrition.
The infant had no hair on the back of her head, which indicated to the nurse that the infant was rarely out of her crib. Her right eye deviated about 40 to 45 degrees from the midline; the nurse did not know if treatment would be initiated at this early age. The infant suffered from a bleeding rash that covered the entire diaper area, front and back. The mother told the nurse she was treating the infant's diaper rash with baby powder and vaseline; the nurse, however, did not see either powder or vaseline. The nurse testified that this treatment was not recommended for the infant's severe rash, and that the treatment was only compounding the problem. The infant had not been given any immunizations.
The infant's ears had the same brown, crusty matter as her sister's, both inside and behind the ears. Both eardrums were completely occluded with wax. This greatly concerned the nurse because the infant had no reaction to sound. An instrument which emits a high sound was placed against the infant's head and she did not react. The nurse also noted that, during their visit, the infant had absolutely no expression. She did not cry, laugh, or smile.
The nurse was also able to feel the infant's liver below the rib cage and down in the abdominal area, an abnormal condition. The nurse also observed one bowel movement which was "whitish-gray"; that, too, was abnormal. The nurse explained this was *49 an indicator of some problem with the liver, bile duct, or stomach.
Following the medical assessment, the social worker and nurse believed the children's environment was exposing them to significant risk, and that the children were in need of medical treatment. The social worker and health nurse decided to take the children into protective custody. When the police officer informed the mother that the children were being taken into protective custody, she reacted violently and was arrested for disorderly conduct and obstructing justice.
The children were examined later that day by a physician who found that neither child had been bathed recently and both suffered from chronic dermatitis. The doctor stated that the children were under an increased risk of contracting herpes from their mother because of their existing dermatitis. The older child masturbated in the presence of the doctor and social worker; the doctor noted this was not normal behavior for a 19-month-old child. He also confirmed that the four-month-old infant had had no immunizations.
SRS recommended that the child in need of care petition include a request for the termination of parental rights. No reintegration plan was developed. The State filed child in need of care petitions for both children and requested termination of parental rights. The parents stipulated that the children were children in need of care and the district court adjudged the children to be children in need of care on November 26, 1985. The hearing on the remainder of the termination petition was continued to January 1986.
During the two days of hearings, the mother testified at length. She informed the court that she had been relinquished by her mother at a very young age. Her father physically abused her as a very young child and began having sexual relations with her at age 13. She repeatedly ran away from home and various foster homes and detention centers. She was 16 when the first baby was born and 18 when the petition was filed. She admitted she was not providing adequate care for the children. Although she also admitted that she could benefit from parenting classes and would be willing to attend, she repeatedly stated she did not like or trust social workers, that she had problems with all social *50 workers, and that she had not been able to work with them. The mother also stated she had been wrong in the past and would be willing to work with social workers; however, she stated she had not yet found the right social worker for her case.
The mother, the public health nurse, and the social worker testified that the mother had repeatedly refused offered services. The mother's history, coupled with her repeated refusal of offered services in Alabama, Nebraska, Kansas, and Missouri, led the social worker to conclude that significant changes in her parenting skills would not occur in the near future. On January 31, 1986, the district court terminated all parental rights to both children and committed the children to the custody of SRS.
The mother contends the district court's failure to require the preparation of a reintegration plan constitutes error.
K.S.A. 38-1565(a) provides:
"If a child is placed outside the child's home and no plan is made a part of the record of the dispositional hearing, a written plan shall be prepared which provides for reintegration of the child into the child's family or, if reintegration is not a viable alternative, for other placement of the child. If the goal is reintegration into the family, the plan shall include measurable objectives and time schedules for reintegration. The plan shall be submitted to the court not later than 60 days after the dispositional order is entered. If the child is placed in the custody of the secretary, the plan shall be prepared and submitted by the secretary. If the child is placed in the custody of a facility or person other than the secretary, the plan shall be prepared and submitted by a court services officer." Emphasis added.
The wording of K.S.A. 38-1565(a) recognizes that reintegration may not be a viable alternative in all child in need of care cases.
K.S.A. 38-1581(a) permits the inclusion of a request for termination of parental rights in the initial child in need of care petition. K.S.A. 38-1581(a) states:
"Either in the petition filed under this code or in a motion made in proceedings under this code, any interested party may request that the parental rights of either or both parents be terminated." Emphasis added.
This section "recognizes that the initial circumstances surrounding the filing of a petition may warrant termination of parental rights in the adjudicatory hearing. However, in most cases, termination is requested and considered only after extensive efforts to work the child back into the home." Kan. Jud. Council Bull. 47, comment (June 1981).
*51 Therefore, since the initial child in need of care petition may include a request for termination of parental rights and K.S.A. 38-1565(a) recognizes that reintegration may not be a viable alternative in all child in need of care cases, we conclude the development of a reintegration plan prior to termination of parental rights is not mandatory. We further conclude, under the facts of this case, that reintegration was not a viable alternative because the mother repeatedly refused services and evidenced no interest or potential in altering her living habits for the benefit of her children. The district court's failure to require the preparation of a reintegration plan in this case was not error.
The mother further contends the district court's termination of her parental rights is not supported by clear and convincing evidence.
K.S.A. 38-1583(a) sets forth the statutory standard for termination of parental rights:
"When the child has been adjudicated to be a child in need of care, the court may terminate parental rights when the court finds by clear and convincing evidence that the parent is unfit by reason of conduct or condition which renders the parent unable to care properly for a child and the conduct or condition is unlikely to change in the foreseeable future." Emphasis added.
The standards of appellate review of parental unfitness were stated in In re Reed, 8 Kan. App.2d 602, 605, 663 P.2d 675 (1983):
"On appellate review, the findings of the lower court, that a child is `deprived' and a parent `unfit,' will not be disturbed if there is substantial competent evidence to support them. [Citation omitted.] And, when reviewing the evidence, the appellate court considers it in the light most favorable to the party prevailing below. [Citation omitted.]"
The district court must find the parent unfit before parental rights may be severed. Reed, 8 Kan. App.2d at 604. This court discussed the term "unfit" in In re Hambelton, 2 Kan. App.2d 68, 71, 574 P.2d 982, rev. denied 225 Kan. 844 (1978):
"The Kansas Supreme Court has considered on several occasions what renders a natural parent unfit for custody. In the case of In re Armentrout, 207 Kan. 366, pp. 371-2, 485 P.2d 183, the Supreme Court defined `unfit' as meaning, in general, "`unsuitable, incompetent or not adapted for a particular use or service. As applied to the relation of rational parents to their child, the word usually although not necessarily imports something of moral delinquency. Unsuitability for any reason, apart from moral defects, may render a parent unfit for *52 custody.'" The term `moral delinquency' was not further defined. We would define it as being delinquent in one's habits of life or mode of conduct.
"In the case of [In re Vallimont, 182 Kan. 334, 340, 321 P.2d 190 (1958)], the Supreme Court stated that a parent who neglects or refuses, when able to do so, to provide proper or necessary support or other care necessary for the child's well-being is unfit. The court went further and stated that apart from other moral defects, the incapacity to appreciate and perform the obligations resting upon parents might render a parent unfit."
K.S.A. 38-1583(b) lists factors the district court shall consider in making its determination. Any one of the factors listed therein may establish grounds for termination. The court should, however, evaluate all the applicable factors. K.S.A. 38-1583(e). Subsection (e) also provides that the court's primary consideration shall be "the physical, mental or emotional condition and needs of the child." The factors set forth in K.S.A. 38-1583(b)(4), (7), and (8) are clearly relevant to this case.
Under K.S.A. 38-1583(b)(4), the district court shall consider "physical, mental or emotional neglect of the child." We have set forth the physical neglect of both children at length, and we will not repeat those facts here. The evidence indicates the children were not properly bathed, fed, housed, or provided with needed medical care. There is abundant evidence in the record to support the district court's finding that the mother failed to care for the children "sufficiently to provide for [their] minimally acceptable needs."
Under K.S.A. 38-1583(b)(7), the court shall consider that "reasonable efforts by appropriate public or private child caring agencies have been unable to rehabilitate the family." Under K.S.A. 38-1583(b)(8), the district court shall also consider "lack of effort on the part of the parent to adjust the parent's circumstances, conduct or conditions to meet the needs of the child." We will consolidate our review of the various agency efforts extended to this family with our review of the mother's effort to adjust her conduct to meet her children's needs.
We note from the record that the mother refused homemaker services in Nebraska. She also refused a counseling program for adults who had been sexually molested as children. In July 1984, the mother contacted a public health nurse about her own health and the infant's rash. The public health nurse diagnosed the mother as having herpes, but the mother refused to accept *53 follow-up treatment for herself and her child from public health services. She also refused available literature concerning nutrition, child care, and personal hygiene. In October 1985, before the children were removed from the home, the mother refused "in-home" services and told the social worker that "the kids would be better cared for by someone else." On November 5, 1985, after the petition had been filed, the mother met with the social worker and again refused offered services. In sum, the mother did not accept offered assistance. Nor did she evidence any effort or desire to change her attitude or lifestyle in the foreseeable future so that she and her children could benefit from offered medical care or child care training.
Affirmed.