NOT DESIGNATED FOR PUBLICATION

No. 122,602

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interests of M.B. and M.B.,
Minor Children.

MEMORANDUM OPINION

Appeal from Pottawatomie District Court; JEFFREY R. ELDER, judge. Opinion filed December 11, 2020. Affirmed.

*Jack Turner*, of Alma, for appellant natural father.

*Sherri Schuck*, county attorney, for appellee.

Before POWELL, P.J., GREEN and STANDRIDGE, JJ.

PER CURIAM: Father appeals the termination of his parental rights to two of his children: M.R.D.B. and M.J.D.B. He argues that the district court erred in finding he was unfit because the State never provided him with a plan setting forth goals he needed to achieve in order to reintegrate with his children. He also challenges the district court's ruling that his unfitness was unlikely to change in the foreseeable future. Finally, he asserts that the district court abused its discretion in terminating his parental rights. But evidence presented at the termination hearing established Father had been incarcerated on a felony conviction for much of the child in need of care (CINC) proceeding, he previously emotionally and physically abused the children, he failed to adjust his circumstances to meet the needs of his children, and he failed to maintain regular contact with the children for the almost four-year period they were not in his physical custody. And although the court is required to adopt a permanency plan, there is no requirement

that the permanency plan include a goal of reintegration. We find clear and convincing evidence supports the district court's finding of unfitness. We further find the district court did not abuse its discretion in deciding termination of Father's parental rights was in the best interests of the children. Accordingly, we affirm.

FACTS

On July 27, 2018, the State filed CINC petitions as to 10-year-old M.J.D.B. and 8-year-old M.R.D.B. The petitions alleged that in May 2017, Mother left the children with the maternal grandparents in Topeka. Mother left no contact information for either parent, no items for the children, and no money for the grandparents to financially support the children. The children resided with the grandparents until May 2018, until they moved to Wamego to live full time with their maternal aunt and uncle because the grandparents had health issues and could no longer care for the children. The uncle filed a report with the Wamego Police Department (WPD) on June 27, 2018, because he feared for the children's safety should they have to go back and live with Mother. He reported to the WPD that Father was in jail in Shawnee County on weapons and drug-related charges, Mother was homeless, and both parents had been addicted to methamphetamine for several years. The uncle also told WPD that Mother had not financially provided for the children at any point while they lived with the grandparents or with the aunt and uncle.

On August 16, 2018, the State served Father at the Shawnee County Jail with a summons for the temporary custody hearing. On August 21, 2018, Father filed a series of pro se pleadings with the district court requesting court-appointed counsel, challenging the assertion that M.J.D.B. and M.R.D.B. were children in need of care, and requesting a change of venue to Shawnee County. On August 29, 2018, the district court held the temporary custody hearing. Neither parent appeared at the hearing but, relevant here, the court appointed Jack Turner to represent Father. The court ultimately found that M.J.D.B. and M.R.D.B. were children in need of care because Father was in custody and because

2

Mother did not have stable housing. The court directly placed the children with the aunt and uncle—the Department for Children and Families (DCF) was not given custody. The court further ordered the aunt and uncle to apply for family preservation services, and it also left any decision regarding visitation with the parents to the aunt and uncle. Although the court did not give DCF legal or physical custody of the children, it ordered DCF to provide family preservation services to the aunt and uncle and submit a permanency report to the court before the next scheduled hearing. The court then set the matter for adjudication, and both Father and his attorney were notified of the October 24, 2018 hearing on that issue.

As ordered by the district court, DCF—through its contractor Kaw Valley Behavioral Healthcare (KVC)—submitted a permanency report to the court on October 15, 2018, in anticipation of the upcoming adjudication hearing. This report, authored by KVC Licensed Professional Counselor Paula Dodge, provided the court with information about the children in their current placement. The report reflected that Dodge physically visited the children in the current placement six times and telephonically visited with the children four times between September 4, 2018, and October 12, 2018. Dodge also visited the children at their school on one occasion during that time period. Based on these visits, Dodge reported that the needs of the children were being met by the aunt and uncle; specifically, the children were engaging in individual and family therapy to deal with past trauma, were doing well in school, and were attending all medical appointments, including a neurologist for one of the children who experienced ongoing seizures. Dodge also reported that she had completed a walk-through of the aunt and uncle's home and found no issues or concerns, that the uncle was retired and the aunt was employed as a registered nurse, and that the aunt and uncle successfully completed drug and alcohol screenings. Finally, Dodge noted that the placement family participated in case planning on September 20, 2018, and the permanency goal and objectives were to work toward renewing KanCare medical insurance for the children and having the court grant permanent custody of the children to the aunt and uncle.

Although Father got out of jail at some point in September 2018, he failed to personally appear for the adjudication hearing on October 24, 2018. Nevertheless, his attorney appeared on his behalf. At the hearing, the district court found that M.J.D.B. and M.R.D.B. were without the care and control necessary for their physical, mental, and emotional health. It also found that they had been physically or emotionally abused or neglected and that their parents abandoned them. As a result, the court adjudicated M.J.D.B. and M.R.D.B. as children in need of care. The court ordered that the children remain in the legal custody of the aunt and uncle and that neither parent would be allowed visitation with the children until the parents personally appeared in court. The court also ordered continued family preservation services for the children with the placement family. The court set the matter for disposition, and notice of the hearing was sent to Father at his last known address in Topeka and to Turner.

On November 27, 2018, about a week before the scheduled dispositional hearing, Dodge submitted a second permanency report to the court. The report reflected that Dodge physically visited the children in the current placement four times and telephonically visited with the children six times between October 16, 2018, and November 19, 2018. Dodge also visited the children at their school on one occasion during that time period. Dodge reported that the aunt and uncle continued to meet the children's medical, dental, and mental health needs, and the children were showing improvements in school. In meeting with the children individually and together, Dodge indicated that both reported being happy and feeling safe in their current living environment. Dodge concluded that she felt it would be in the children's best interests to maintain legal and physical custody with the aunt and uncle.

The dispositional hearing was held on December 5, 2018. Although Father was not incarcerated when this hearing took place, he once again failed to personally appear. Turner appeared on Father's behalf. At the end of the hearing, the district court found that "[a]ppropriate public and private agencies have made . . . reasonable efforts to facilitate

the permanency plan." In specifying its basis for this finding, the court added that the placement family received family preservation services and counseling. It then approved and adopted the permanency plan submitted by KVC as the plan for permanency in the case: continuing legal and physical custody with the aunt and uncle. The court ordered the children to remain in the aunt and uncle's custody with continued family preservation services. Because Father had felony charges pending in Shawnee County and because Mother could not be located, the court also ordered that neither parent would be allowed visitation until further order of the court. Finally, the court set the matter for a permanency review hearing. Father's attorney signed the order of disposition, which included notice of the April 10, 2019 permanency review hearing.

On December 6, 2018, the children's therapist submitted a status report on the ongoing mental health of the children. After setting forth a brief review of the children's history of trauma in the birth home and the attendant behaviors resulting from that trauma, the therapist reported that the children were making significant progress:

"I have observed a significant change in the children since the start of their therapeutic journey. Initially, it was difficult for the children to sit still, answer questions without talking over one another, and display even basic impulse control. After several months of steady routine, behavior plans and rewards/consequence incentives, and stable parenting, both children have shown a dramatic improvement in functionality both at home and within the therapeutic environment."

In summarizing the treatment plan and progress, the therapist reported:

"Our therapy goal is to process the abuse and trauma from the past in a safe therapeutic environment and decrease in anger, anxiety, and acting out in their home environments. Objectives Include 1) learning 2-3 coping skills to utilize when feeling overwhelmed or experiencing intrusive memories of abuse/neglect and 2) Decrease in anxiety/anger by practicing deep breathing, relaxation, and age appropriate mindfulness training.

5

"Currently, both children have displayed positive progress toward treatment goals and objectives."

At the end of the report, the therapist recommended that the children "continue with individual therapy at this time with their aunt and uncle as custodians."

The district court held the permanency review hearing on April 10, 2019, as scheduled. At that time, Father was back in custody and did not personally appear for the hearing, but Turner appeared on Father's behalf. The court took notice of the therapist's report and ordered the children to remain in the legal and physical custody of the aunt and uncle with continued family preservation and counseling services. It further ordered that neither parent was allowed visitation with the children until they contacted their attorneys and appeared at the next hearing. The court set the matter for another permanency review hearing. Father's attorney signed the journal entry, which included notice of the next permanency review hearing scheduled for May 22, 2019. Because Father was now in custody, the court ordered that Father be transported for the May 22, 2019 hearing.

At some point before the permanency hearing, Father wrote a letter to the aunt asking about the children. In the letter, Father described how he and Mother both suffered from drug addiction and how they previously squatted in abandoned homes with no water, no heat, and very little food. It was the first time Father contacted the aunt or uncle since M.J.D.B. and M.R.D.B. began living with them.

On May 2, 2019, about two weeks before the next permanency hearing, Dodge submitted a third permanency report to the court. The report reflected that Dodge physically visited the children in the current placement four times and visited with the children by text three times between January 24, 2019, and April 24, 2019. Dodge updated the court on the children's progress as it related to health, school, and home, noting rules in the home regarding homework and use of electronics. Dodge reported that

the children had expressed fear to their therapist about leaving their current placement and going back to their natural parents. Dodge also reported that she was unaware if the natural parents were employed and noted that Father was last known to be in jail awaiting trial. Dodge concluded that she felt it would be in the children's best interests to maintain legal and physical custody with the aunt and uncle:

"This worker feels that [the children] continue to be in a safe and stable home with [aunt and uncle]. They appear to be happy about being in the home, and they will verbalize how they want to stay where they are. [Aunt and uncle] allow and encourage the children to continue having contact with their older siblings. They continue to nourish the positive growth of the children by providing the children with love, support, stability, limits and rules: along with assuring their medical, dental, vision and mental health needs are being met."

The permanency review hearing took place on May 22, 2019, as scheduled and Father was present in person and with his attorney. In its journal entry, the district court found the parents failed to make the progress necessary to have reintegration as a permanency goal. We note as an aside here that, in fact, reintegration was never the permanency goal in this case. The court reaffirmed this fact in its journal entry when it found that appropriate public or private agencies (in this case, KVC) made reasonable efforts to assist and support the placement family (aunt and uncle) in accomplishing the current permanency goal. In this case, that goal was to maintain physical and legal custody of the children with the aunt and uncle to meet their needs and keep them safe. Based on the facts presented and the court's finding that the natural parents had made no reasonable efforts to care for and see the children while out of their care and custody, despite knowing where they had been placed, the court changed the permanency plan from maintaining physical and legal custody of the children with the aunt and uncle to adoption or permanent custodianship. To that end, the court ordered the State to file a motion to terminate parental rights or a motion to establish a permanent custodianship within 30 days.

On June 18, 2019, the State filed its motion to terminate Mother and Father's parental rights. The motion alleged that Mother left the children with the grandparents, neither parent provided any type of support for the children while in the grandparents' care, and neither parent communicated with the grandparents or left any personal contact information. After the children went to live with the aunt and uncle in May 2018, the motion alleged that neither parent provided the children with any support and that Father had only attempted to contact the aunt and uncle about the children once. Otherwise, neither parent communicated with the aunt or uncle. The motion further alleged that Father was released from custody for a brief period, but during that time, he admitted that he made no effort to go through his attorney to seek permission from the court to see or contact M.J.D.B. and M.R.D.B. and did not provide financial or other support for the children in any way. The motion also alleged Father previously admitted to struggling with substance abuse, to not having stable and permanent housing, and to having previous CINC cases involving M.J.D.B. and M.R.D.B. and Father's other older children. The State asserted that Mother and Father failed to adjust their circumstances to meet their children's needs due to their issues with drug abuse, lack of steady housing, and Father's consistent incarceration. The State asked the court to find the parents unfit and to terminate their parental rights.

Two weeks before the scheduled termination hearing, KVC filed its fourth permanency review report to the court. The report reflects that a member of the KVC family preservation team physically visited the children in the current placement six times and visited with the children by text three times between January 24, 2019, and June 27, 2019. This report essentially mirrors the report submitted on May 2, 2019, with updates where needed. After reviewing the children's progress as it related to their health, school, and home, the report recommended that the children remain in the legal and physical custody of the aunt and uncle and that KVC continue to provide family preservation services to maintain that placement.

The district court held the termination hearing on July 24, 2019, as scheduled. However, the hearing proceeded only as to Mother because there was a medical emergency involving one of the witnesses scheduled to testify as to why Father's parental rights should be terminated. After assessing the evidence, the district court found Mother to be unfit for three reasons: (1) her drug use rendered her incapable of caring for the children, (2) failure of reasonable efforts by the appropriate agency to reintegrate the family, and (3) her lack of effort to adjust her circumstances and failure to carry out a reasonable court-approved reintegration plan. The court then concluded that it was in M.J.D.B. and M.R.D.B.'s best interests to terminate Mother's parental rights. A termination hearing as to Father was scheduled for September 18, 2019.

After a series of continuances for various reasons, the district court held the termination trial as to Father on January 13, 2020. In support of its motion to terminate Father's parental rights, the State called three witnesses: (1) the maternal grandfather, (2) the maternal aunt, and (3) the children's therapist. The grandfather testified that he and the grandmother took custody of the children in 2016 or 2017. Mother provided the grandfather with a signed and notarized letter dated February 1, 2018, stating that she was giving custody of both children to the grandparents. He described Mother and Father's relationship as volatile and dysfunctional—when the children lived with the parents, there were instances of domestic violence between the parents and there had been "a lot of law enforcement contact" with the parents during that time. He also described how during that time both parents were addicted to drugs and they were squatters. The grandfather also testified that he and the grandmother previously took custody of M.J.D.B. and M.R.D.B. in 2011 during prior CINC proceedings where it was alleged that Father was incarcerated and Mother was on drugs. Grandfather testified that the children had lived with him and grandmother several times on and off again since the children were born. After the children came to live with the grandparents in 2016 or 2017, the grandfather testified that neither parent provided any kind of support for the children, Father only

9

came to visit the children once or twice, and Father never contacted the grandparents to discuss a plan to care or provide for the children while in the grandparents' care.

The aunt then took the stand and testified that she and the uncle assumed custody of M.J.D.B. and M.R.D.B. in May 2018—this was largely due to the fact that the grandmother previously suffered a stroke and neither grandparent could physically care for the children any longer. She said that when the children first came to live with them, they exhibited severe behaviors. She described how M.J.D.B. would have fits of rage and bang his head against the wall and how both children were so attached to each other that they could not be separated. The aunt testified that the children told her about regularly witnessing their parents fighting and being violent. M.J.D.B. told his aunt and uncle about a time he watched Father "shoot up" Mother with a needle in Mother's leg. M.J.D.B. also told her about a time Father punched him in the stomach for breaking something and about another time where he witnessed Father beheading one of the family dogs and boiling its skull in a pot. Since living with the aunt and uncle, the aunt testified that she saw improvements in the children's behaviors—they improved in school, and they would talk with aunt and uncle versus acting out. She noted, however, that the children would regress and get extremely upset every time a court hearing drew near. She explained that the children told her they were afraid of Father and they feared going back to live with him. The aunt also testified that while the children lived with aunt and uncle, neither parent provided the children with any type of support and that Father only wrote one letter to her asking about the children.

The children's therapist testified next. She had been treating M.J.D.B. and M.R.D.B. since July 2018 and noted they consistently attended appointments once every other week or once every three weeks. When she first met with the children, the therapist testified that they presented with multiple severe issues, including: impulsiveness, anxiety, depression, emotional dysregulation or inappropriate emotional expression, dissociation from trauma, and an inability to be separated. She said that both children

disclosed several instances of physical abuse and neglect by the parents. She testified that M.J.D.B. also told her that Father punched him in the stomach and that several times he recounted the story about witnessing Father killing and mutilating one of the family dogs. The therapist explained that the children reported not getting fed sometimes while living with the parents and that their older sibling would often prepare meals for them. She also described the children's reports of witnessing domestic violence between the parents. They told her that when the parents were violent with one another, the older sibling would take the children and hide them downstairs with a knife so the children could protect themselves. They also told her that they witnessed their parents using drugs. The therapist testified that both children were scared of going back to live with their parents and that they reported they would not feel safe with the parents. These fears would manifest as nightmares of their parents trying to steal them away from the aunt and uncle's home. She testified these fears usually occurred around court dates. Since first seeing the children, the therapist testified she saw huge improvements in their behaviors, such as a decrease in their anxiety, depression, and feelings of worthlessness. She explained that the children were exhibiting fewer impulsive behaviors and could be separated. She said they were doing well in school and could follow routine and structure, which is something they could not do before. The therapist specifically testified that she believed it was not in the children's best interests to return to Father's custody because there would be a lot of regression. Before she would even consider suggesting visits between the children and Father, the therapist said Father would need individual therapy, there would need to be family therapy, psychological evaluations would be necessary, and Father would have to complete a parenting evaluation and anger management courses.

After the close of the State's evidence, Father testified on his own behalf. He stated his belief that Mother was only taking the kids to the see their grandparents for a weekend—he did not know she was permanently dropping them off. He admitted that he did not try to see the children while they were in the grandparents' care because he

11

testified that he and the grandparents did not get along and he was afraid they would call the police. He confirmed the grandfather's testimony that he only saw the children twice while they were in the grandparents' care. Father also testified that he never went to see the children while they were in the aunt and uncle's custody. Father admitted that he was incarcerated for much of the CINC proceedings; specifically, he was in custody between May or June 2018 to September 2018 and again starting in March 2019. At the time of his termination trial, he was in prison on felony charges and was expected to be released in late February 2020. He testified that he was released for a short period between September 2018 and March 2019. During that time he had a job, but he explained he did not provide any financial support to the children because the aunt and uncle would not let him see the children. However, he then stated that he was paying child support during that time, but later admitted that he was actually paying child support arrearages from a previous CINC matter involving M.J.D.B. and M.R.D.B. Father finally admitted that he did not provide any additional financial support to the children. Also during that time, he stated he completed substance abuse treatment, but he did not provide his attorney or the court with proof that he had done so. Father admitted that he did not try to attend any parenting classes during that time. He also could not explain why he did not appear for the adjudication hearing or why he did not contact his attorney at that time.

Father testified that he wanted to be involved in his children's lives, but he never had an opportunity throughout the CINC proceedings to do so. Father claimed that no social worker ever contacted him and that he knew of no plans to reintegrate with M.J.D.B. and M.R.D.B. He testified that after he was scheduled to be released from prison, he planned on attending job training in Kansas City for two weeks and he was going to work on securing stable housing for himself and the children. Father indicated he knew reintegration would not happen right away but that he would do what the court told him to do to be a "responsible father" for his children. Father denied ever using drugs in front of the children, he denied abusing the children, and he denied ever killing the family dog. However, Father admitted that in the three to four years the children were not

in his custody, he only saw them twice, he did not request custody of the children, he did not provide any financial support for the children, and he only contacted the aunt once to inquire about the children.

DCF worker Lisa Carbon then briefly testified. She specifically stated that permanency plans with the goal of reintegration usually were only made when children were placed in DCF's custody. Because the children in this case were directly placed with the aunt and uncle, DCF did not develop a permanency plan with the goal of reintegration.

After considering the evidence and arguments presented, the district court first determined there was clear and convincing evidence that Father was unfit to parent the children. In reaching this conclusion, the court explained that in the three to four years the children were not in his custody, he failed to adjust his circumstances to meet their needs. The court stated that between 2016 and June 2018, Father was not incarcerated, and the evidence showed that he did nothing to adjust his circumstances to take care of M.J.D.B. and M.R.D.B. during that time. Father was in jail from June 2018 to September 2018, during which time he was aware of the proceedings because he filed pro se pleadings in August 2018 and had an attorney appointed to represent him. Yet, after he got out of jail, Father failed to appear for the adjudication and dispositional hearings, which the court explained was further evidence that Father lacked concern for the children and continued failing to adjust his circumstances. The court further found that Father failed to maintain any regular contact or communication with the children during the CINC proceedings and had physically or emotionally abused the children over the years.

The district court then ruled that Father's unfitness was unlikely to change in the foreseeable future. Noting that the children had not been in Father's custody for almost four years, the court found that although he may soon be released from prison, Father had

showed the court that he would not be able to parent his children without the court specifically telling him what to do.

Based upon the children's therapist's testimony, the events reported by the children, and the significant improvements the children had made since coming into the care of the aunt and uncle, the district court ordered that it was in M.J.D.B. and M.R.D.B.'s best interests to terminate Father's parental rights.

ANALYSIS

K.S.A. 2019 Supp. 38-2269(a) provides that a district court may terminate parental rights if it finds by clear and convincing evidence that the parent is unfit and that the parent's unfitness is unlikely to change in the foreseeable future. When reviewing these termination decisions, appellate courts must consider whether, after reviewing all the evidence in a light most favorable to the State, it is convinced that a rational fact-finder could have found it highly probable that the parent's rights should be terminated. Appellate courts do not reweigh conflicting evidence, pass on the credibility of witnesses, or redetermine questions of fact when reviewing these determinations. *In re K.L.B.*, 56 Kan. App. 2d 429, 445, 431 P.3d 883 (2018).

When a parent challenges a district court's decision not to order a reintegration plan, such a question raises a legal issue, which this court reviews de novo. *In re P.J.*, 56 Kan. App. 2d 461, 468, 430 P.3d 988 (2018).

On appeal, Father challenges the district court's ruling that he is unfit to parent M.J.D.B. and M.R.D.B. and that his unfitness is unlikely to change in the foreseeable future. As to unfitness, Father first argues that he could not be unfit because the district court never afforded him the opportunity to successfully reintegrate with his children as no permanency plan with a goal of reintegration was ever created and no reasonable

14

efforts were made on any agency's part to rehabilitate the family. He further argues that there was insufficient evidence in the record to support the court's finding of unfitness. As to the foreseeable future, Father asserts that the district court incorrectly determined his conduct was unlikely to change in the foreseeable future because he was not given a chance to work toward reintegration once he was out of prison.

1. *Unfitness*

a. *Lack of reintegration plan*

Father first argues that he was never provided with the opportunity to comply with a reintegration plan before termination. He notes that K.S.A. 2019 Supp. 38-2263(b) specifically requires a district court to order the development of an initial permanency plan once a child is subject to the court's jurisdiction under the revised Kansas Code for Care of Children (KCCC), K.S.A. 38-2201, et seq. He further asserts that K.S.A. 2019 Supp. 38-2263(c) requires the permanency plan to be written and that it be created in consultation with the natural parents where possible. Father argues that the district court never created a reintegration plan as required by statute, and as a result, he never had a chance to successfully work toward reintegration with his children. Father's argument necessarily assumes that reintegration is always the goal of any permanency plan that is created. But as explained below, this argument is misplaced.

Putting Father's argument into context, the KCCC outlines the procedure for CINC cases. First, the State files a petition alleging that a child is in need of care based on one or more statutory circumstances outlined in K.S.A. 2019 Supp. 38-2202(d). Once a CINC petition has been filed, a district court usually holds a temporary custody hearing to determine appropriate temporary placement for the child. See K.S.A. 2019 Supp. 38-2235(a); K.S.A. 2019 Supp. 38-2243. If a child has been taken into police protective custody, the court must hold a temporary custody hearing within 72 hours of the child

being placed in police protective custody. K.S.A. 2019 Supp. 38-2235(a)(2); K.S.A. 2019 Supp. 38-2243(b). Where, as here, the child has not been taken into police protective custody, the court need only to set the matter for such a hearing within 30 days of the petition being filed. K.S.A. 2019 Supp. 38-2235(a)(1). Whenever a district court determines that a temporary custody order is warranted, it may decide to place the child with a parent, a relative, any unlicensed person with close emotional ties to the child, a youth residential or shelter facility, or the DCF Secretary. K.S.A. 2019 Supp. 38-2243(g)(1).

The district court then holds an adjudication hearing to determine whether the State has presented clear and convincing evidence that the child is a child in need of care. If the child is a child in need of care, the court must enter an order adjudicating the child as such. If not, the court must dismiss the petition. Any adjudication order must be entered within 60 days of the filing of the CINC petition, subject to limited exceptions. K.S.A. 2019 Supp. 38-2251.

In conjunction with or within 30 days following adjudication, the district court usually holds a dispositional hearing. K.S.A. 2019 Supp. 38-2253(b). Once a child has been adjudicated a child in need of care, the court convenes this hearing to consider various permanent living arrangements for the child. K.S.A. 2019 Supp. 38-2253(a). There is more complexity to the statutory scheme governing dispositional orders than the other orders discussed so far. The timing for dispositional orders is dictated by K.S.A. 2019 Supp. 38-2253(b), which states "[a]n order of disposition may be entered at the time of the adjudication if notice has been provided . . . but shall be entered within 30 days following adjudication, unless delayed for good cause shown." The substance of the dispositional hearing and attendant order are addressed by K.S.A. 2019 Supp. 38-2253, which states:

16

"(a) At a dispositional hearing, the court shall receive testimony and other relevant information with regard to the safety and well being of the child and may enter orders regarding:

(1) Case planning which sets forth the responsibilities and timelines necessary to achieve permanency for the child; and

(2) custody of the child."

Under K.S.A. 2019 Supp. 38-2255(b) and (c), there are two roads that may be taken regarding custody—either the district court places the child in the parent's custody or it removes the child from parental custody. If the latter, the court must make certain findings. For example, it must find probable cause that certain conditions exist, such as "allowing the child to remain in [the] home is contrary to the welfare of the child." K.S.A. 2019 Supp. 38-2255(c)(1)(B). And if the court makes the required findings and removes the child from the parent's custody, it may award custody to: (1) a child's relative, (2) a person with whom the child has close emotional ties, (3) any other suitable person, (4) a shelter facility, (5) a youth residential facility, or (6) the Secretary. This custody order "shall continue until further order of the court." K.S.A. 2019 Supp. 38-2255(d). In addition, if the person to whom custody is awarded is not a parent, a permanency plan that conforms to the requirements of K.S.A. 2019 Supp. 38-2264 (permanency hearing: purpose, procedure, time for hearing, and authorized orders) must be prepared. K.S.A. 2019 Supp. 38-2255(e).

Where, as here, a district court awards custody to an out-of-home relative or placement, K.S.A. 2019 Supp. 38-2255(e) provides that a permanency plan shall be prepared. If that permanency plan is presented at the dispositional hearing, the court may determine if reintegration is a viable option or not. K.S.A. 2019 Supp. 38-2255(e). However, K.S.A. 2019 Supp. 38-2257 provides: "If a child is placed outside the child's home at the dispositional hearing and no permanency plan is made a part of the record of the hearing, a written permanency plan shall be prepared pursuant to K.S.A. 2019 Supp. 38-2263, and amendments thereto." If the court determines at the dispositional hearing

17

that reintegration is not a viable alternative, it must initiate proceedings to terminate parental rights as outlined in K.S.A. 2019 Supp. 38-2255(f).

If the district court does not address permanency at the dispositional hearing, the matter usually proceeds to a permanency hearing. The purpose of a permanency hearing is to determine progress toward accomplishing the permanency plan. K.S.A. 2019 Supp. 38-2264(a). The court generally decides at this hearing whether reintegration is viable or not. K.S.A. 2019 Supp. 38-2264(b). This hearing must be held within 12 months of the date the court authorized the child's removal from the home. K.S.A. 2019 Supp. 38-2264(f). Where, as here, the court determines that reintegration is no longer a viable option, it must initiate proceedings to terminate parental rights as outlined in K.S.A. 2019 Supp. 38-2264(i).

In this case, the district court held a dispositional hearing on December 5, 2018. Before the dispositional hearing was held, KVC filed with the court a family preservation court report, expressly stating that the preservation (or permanency) goal was to ensure the safety of the children by keeping them placed with their aunt and uncle. To further that goal, KVC recommended that the children continue in the legal and physical custody of their aunt and uncle. Although Father was not incarcerated when this hearing took place, he failed to personally appear. Turner appeared on Father's behalf. At the end of the hearing, the district court found that "[a]ppropriate public and private agencies have made . . . reasonable efforts to facilitate the permanency plan." In specifying its basis for this finding, the court added that the placement family received family preservation services and counseling. It then approved and adopted the permanency plan submitted by KVC as the plan for permanency in the case: continuing legal and physical custody with the aunt and uncle.

Based on our review of the record, KVC properly drafted a permanency plan for the children and the district court later adopted that plan in its order of disposition. So

18

while the KCCC may require development of a general permanency plan for a child that is in need of care, it does not require the court to order the development of a permanency plan with a specific goal of reintegration as Father argues on appeal. Father cites to no legal authority showing otherwise. As previous panels of this court have found, a district court is not necessarily required to provide a parent with an opportunity to reintegrate with his or her children or to develop a reintegration plan before termination. See, e.g., *In re P.J.*, 56 Kan. App. 2d at 468 (recognizing that development of reintegration plan before termination is not compulsory); *In re J.G.*, 12 Kan. App. 2d 44, 51, 734 P.2d 1195 (1987), *overruled on other grounds by In re B.D.-Y.*, 286 Kan. 686, 702-03, 187 P.3d 594 (2008) (concluding that "development of a reintegration plan prior to termination of parental rights is not mandatory" and finding that district court's failure to order a reintegration plan was not error); *In re K.M.*, No. 111,109, 2014 WL 3907119, at *6-8 (Kan. App. 2014) (unpublished opinion) (recognizing that because district court determined reintegration was not viable option, it was not required to order reintegration plan for Father to complete); *In re R.M.C.H.*, No. 104,249, 2011 WL 1344774, at *5 (Kan. App. 2011) (unpublished opinion) (finding that because district court determined that reintegration was not viable option, it was not required to develop reintegration plan before terminating parental rights). Because the district court was not required to develop a reintegration plan as to Father, this basis for challenging the district court's finding of unfitness has no merit.

   b. *Insufficiency of the evidence*

   Because the district court was not required to order a reintegration plan in this case, the analysis turns to whether clear and convincing evidence supported the district court's finding of unfitness. K.S.A. 2019 Supp. 38-2269(a) provides that a district court may terminate parental rights after a child has been adjudicated a child in need of care. The statute lists nonexclusive factors the court shall consider in making an unfitness determination. K.S.A. 2019 Supp. 38-2269(b). The court must also consider a separate

list of nonexclusive factors when a child is not in the parent's physical custody. K.S.A. 2019 Supp. 38-2269(c). Any one of the factors in K.S.A. 2019 Supp. 38-2269(b) or (c) may, but do not necessarily, establish grounds for termination of parental rights. K.S.A. 2019 Supp. 38-2269(f).

In this case, the district court relied on three specific factors in finding Father unfit:  (1) There was clear and convincing evidence that Father previously physically and emotionally abused and neglected the children as outlined in K.S.A. 2019 Supp. 38-2269(b)(4); (2) there was clear and convincing evidence that Father had been convicted of a felony and incarcerated for that crime as provide in K.S.A. 2019 Supp. 38-2269(b)(5); and (3) there was clear and convincing evidence that Father failed to adjust his circumstances to meet the needs of his children as noted in K.S.A. 2019 Supp. 38-2269(b)(8).

On appeal, Father does not specifically challenge any of these findings. Rather, he focuses his argument on a factor that the district court did not rely on in making the unfitness determination:  K.S.A. 2019 Supp. 38-2269(c)(3). K.S.A. 2019 Supp. 38-2269(c)(3) provides that a parent can be declared unfit if the child has not been in that parent's physical custody and that parent fails to carry out a reasonable court-approved reintegration plan. This argument ties back into Father's original argument that the district court was required to order a reintegration plan for Father to follow. However, because the district court was not required to order a reintegration plan as to Father and because it did not rely on this factor in declaring Father unfit, we may disregard Father's analysis as to this point.

But even if we analyze the factors the district court actually relied upon, there is sufficient evidence supporting its ruling that Father was unfit to parent M.J.D.B. and M.R.D.B. pursuant to K.S.A. 2019 Supp. 38-2269(b)(4), (b)(5), and (b)(8).

20

(1) *K.S.A. 2019 Supp. 38-2269(b)(4)*

A district court may find a parent unfit if there is clear and convincing evidence that a parent physically, mentally, emotionally, or sexually abused or neglected their child. K.S.A. 2019 Supp. 38-2269(b)(4). Here, there is clear and convincing evidence to support this finding.

At the termination trial, two of the State's witnesses testified in detail about how the children reported witnessing domestic violence between their parents and how they were the targets of physical and emotional abuse and neglect. The aunt described instances where the children told her they regularly witnessed Mother and Father fighting and being violent with one another. M.J.D.B. reported to his aunt and uncle about a time he saw Father "shoot up" Mother with a needle in Mother's leg. He also recounted disturbing details to his aunt about how Father once punched him in the stomach and how Father beheaded one of the family dogs and boiled its skull in a pot.

The children's therapist reinforced the aunt's testimony. She also described reports from M.J.D.B. about how Father punched him in the stomach and killed and mutilated one of the family dogs. The therapist testified that M.J.D.B. recounted the story about the dog several times over the course of his treatment with her. The therapist also explained how both parents neglected the children by failing to feed them, and their older sibling would have to prepare meals for them. She testified that both children told her this older sibling would protect the children when Mother and Father fought by hiding them in the basement and giving them a knife to protect themselves. Both children also told her that they witnessed their parents using drugs when they lived with Mother and Father.

Both the aunt and the therapist explained that M.J.D.B. and M.R.D.B. consistently reported they were afraid of going back to live with their parents and that they would not feel safe with Mother and Father. Any time a court hearing drew near, the children would

21

regress and become extremely upset because of their fears about returning to their parents' custody.

At the termination proceedings, Father specifically refuted these allegations. On appeal, however, Father does not contest the court's finding under K.S.A. 2019 Supp. 38-2269(b)(4) that he physically, mentally, emotionally, or sexually abused or neglected his children. Because this court does not reweigh the evidence or witness testimony and because the record supports a finding that both children were physically and emotionally abused and neglected, there is clear and convincing evidence to support the district court's finding based on K.S.A. 2019 Supp. 38-2269(b)(4).

(2) *K.S.A. 2019 Supp. 38-2269(b)(5)*

A district court may find a parent unfit if that parent was convicted of a felony and imprisoned. K.S.A. 2019 Supp. 38-2269(b)(5). Here, there is clear and convincing evidence to support this finding.

The CINC proceeding was initiated in late July 2018. By the time the district court held the termination hearing as to Father in January 2020, Father had been incarcerated twice. The first time he was in the Shawnee County Jail between June 2018 and September 2018. The second time he was in prison for a criminal possession of a firearm conviction, and he served that sentence from March 2019 to February 2020. Father did not dispute these facts at the termination hearing. Between July 2018 (when the case was initiated) and February 2020 (when Father was released), Father was in custody for an aggregate total of approximately 14 months.

Significantly, as of the date of the termination hearing, Father still had one month remaining on his prison sentence, and he also admitted that he would be on postrelease supervision following his release. He was unable to testify about any concrete plan

following his release to secure stable employment, obtain stable housing, or generally articulate any goals to become a better, more responsible parent for his children. Rather, he testified that he would do whatever the district court told him to do to reintegrate with his children. Because the record supports a finding that Father was incarcerated on felony charges during the CINC proceeding and before his rights were terminated, there is clear and convincing evidence to support the district court's finding based on K.S.A. 2019 Supp. 38-2269(b)(5).

(3) *K.S.A. 2019 Supp. 38-2269(b)(8)*

A district court may find a parent unfit if there is clear and convincing evidence that the parent has failed to adjust his or her circumstances, conduct, or conditions to meet the needs of the children. K.S.A. 2019 Supp. 38-2269(b)(8). Here, the evidence supports this finding.

The evidence presented at the termination hearing overwhelmingly established that Father consistently failed to adjust his circumstances and conduct over the course of the CINC proceeding. As noted above, he was incarcerated for a majority of the year-and-a-half long proceeding. During the six months he was out of custody, he failed to communicate with his attorney about the case, and he failed to appear at the October 2018 adjudication hearing and the December 2018 dispositional hearing. During that time, even though Father testified he obtained employment, he admitted that he did not provide the children with any financial support. He also admitted that he never attempted to meet the district court's threshold requirements that would enable him to visit the children while he was out of custody. Throughout the entire proceeding, Father only communicated with the aunt about the children once. Father never attempted to communicate or stay in touch with the children.

23

Even before the CINC case was filed, Father made no attempt to be involved in his children's lives. M.J.D.B. and M.R.D.B. spent three to four years living with either their grandparents or their aunt and uncle. In those three to four years, Father only visited the children twice despite knowing where they were located. Aside from the letter he sent to the aunt inquiring about the children, there was no other evidence that Father attempted to contact the relatives or the children directly or indirectly during those three to four years. He never provided the relative placements with any type of support during that time or with any contact information.

The evidence further showed that Father had been in and out of custody since 2007. He had been involved in two previous CINC matters—one that also involved M.J.D.B. and M.R.D.B. He also admitted that when the children lived with the parents, both parents were addicted to drugs and without stable housing. Furthermore, when confronted by the State about his plans to care for the children upon his release from prison in February 2020, Father was unable to articulate any specific plan to do so. He simply testified that he would do whatever the court told him to do.

Because the record supports a finding that Father failed to adjust his conduct and circumstances to meet the children's needs, there is clear and convincing evidence to support the district court's finding based on K.S.A. 2019 Supp. 38-2269(b)(8).

2. *Foreseeable future*

Father next argues that the district court erred in finding that his unfitness was unlikely to change in the foreseeable future. He specifically asserts that he would have been able to reintegrate with his children following his release from prison. However, he recognizes that he would have "need[ed] time to get on his feet" once he was out of custody. Despite that, he argues he would have been able to follow all reasonable plans and tasks required of him to reintegrate with his children.

Clear and convincing evidence must also support a district court's finding that the conduct or condition rendering a parent unfit is unlikely to change in the foreseeable future. This court examines the term "foreseeable future" from the perspective of a child. Children and adults have different perceptions of time, and a child has the right to permanency within a time frame that is reasonable to them. See K.S.A. 2019 Supp. 38-2201(b)(4). A district court may look to a parent's past conduct as an indicator of future behavior. *In re K.L.B.*, 56 Kan. App. 2d at 446-47.

The evidence presented at the termination hearing established that Father's unfitness was unlikely to change in the foreseeable future. In first analyzing Father's past conduct, the evidence established that in the three to four years the children were in relatives' custody, Father failed to maintain regular contact with the children or the placements, and he failed to visit with the children. During that time, Father wrote the aunt only once and saw M.J.D.B. and M.R.D.B. twice. He also never provided any type of financial support for the children. Furthermore, even when Father had the opportunity to participate in the CINC proceedings, he failed to do so. While he was out of custody between September 2018 and March 2019, he did not communicate with his attorney and he did not appear for key hearings. Father only appeared for the permanency hearing in May 2019 and the two termination hearings in July 2019 and January 2020, respectively. This lack of participation in the children's lives and in the CINC proceedings is certainly an indicator that Father would not adjust his unfit conduct in the future.

Furthermore, the State presented clear and convincing evidence that even if Father was released from prison and could work toward reintegration, it would take a considerable amount of time for him to do so. The children had already been out of his custody for three to four years preceding termination. While it is true that Father would be released from prison only six weeks after his termination hearing, he could not provide any concrete plan to obtain stable employment and housing. His testimony showed that he could not act upon his own initiative to become a better, more responsible parent for

25

M.J.D.B. and M.R.D.B. In fact, he specifically testified that the court had to tell him what he needed to do to get his children back—a remark that the district court relied on in making its finding. Furthermore, the children's therapist testified that Father would need to attend several parenting classes, anger management classes, regular individual therapy sessions, and consistent family therapy sessions before she believed it would be a good idea for the children to have visitation with Father. Simply put, by January 2020, the CINC proceedings had already been going on for 18 months, and there was no indication as to how long such a process would take to merely establish a visitation schedule between Father and the children upon Father's release from prison.

Given the length of time the children had been out of Father's custody, the length of time of the CINC proceedings, and the unknown variables following Father's release from prison, the district court correctly determined based on the evidence that Father's unfitness was unlikely to change in the foreseeable future. As such, the district court did not err in determining that Father was unfit.

3. *Best interests*

Father argues the district court abused its discretion in finding termination of parental rights was in the best interests of the children because there was no direct evidence about the emotional trauma the children would suffer should Father's rights be terminated.

Upon making a finding of unfitness of the parent, "the court shall consider whether termination of parental rights as requested in the petition or motion is in the best interests of the child." K.S.A. 2019 Supp. 38-2269(g)(1). In making such a decision, the district court shall give primary consideration to the physical, mental, and emotional needs of the child. K.S.A. 2019 Supp. 38-2269(g)(1). A decision about the best interests of a child rests within the district court's sound discretion. As such, the appellate courts

review these determinations for an abuse of discretion. *In re R.S.*, 50 Kan. App. 2d 1105, 1115-16, 336 P.3d 903 (2014). A judicial action constitutes an abuse of discretion if: (1) no reasonable person would take the view adopted by the trial court, (2) it is based on an error of law, or (3) it is based on an error of fact. *In re M.S.*, 56 Kan. App. 2d 1247, 1255, 447 P.3d 994 (2019).

Here, there was considerable evidence establishing that the district court considered M.J.D.B. and M.R.D.B.'s best interests—i.e., their physical, mental, and emotional needs—before terminating Father's parental rights. In fact, the court specifically pointed to three things supporting its ruling: (1) the children's progress in therapy, (2) the children's numerous reports of abuse and neglect by the parents, and (3) the children's significant behavioral and emotional improvements while in their aunt and uncle's custody. Given the weight of the evidence presented at the termination hearing, the clear progress the children made in therapy and while living with their aunt and uncle, and the fact that the children reported several times that they were scared of Father and of returning to live with him, a reasonable person could have also concluded that it was in the children's best interests to terminate Father's parental rights. And as Father does not allege on appeal any factual or legal mistakes by the district court, the court did not abuse its discretion in terminating his parental rights.

Affirmed.