(961 P.2d 716)
No. 79,562

IN THE INTEREST OF H.A.M., J.F.D., and W.D.M., Minor Children Under the Age of Eighteen Years.

—

Opinion filed July 10, 1998.

*Becky C. Hurtig*, of Derby, for the appellant natural mother.

*Richard L. Dickson*, of Wichita, for the appellant natural father.

*Shawn Elliott*, of the Kansas Department of Social and Rehabilitation Services, for the appellee.

Before LEWIS, P.J., PIERRON, J., and JACK L. BURR, District Judge, assigned.

PIERRON, J.: K.H. (the natural mother of H.A.M., J.F.D., and W.D.M.) and D.M. (the natural father of H.A.M. and W.D.M.) appeal the termination of their parental rights. They allege the trial court failed to comply with the Indian Child Welfare Act (ICWA), 25 U.S.C. 1901 *et seq.* (1994), and the State failed to produce evidence to prove beyond a reasonable doubt that the return of the children to their parents would result in significant harm to the children.

On November 4, 1994, the State filed child in need of care petitions for H.A.M., J.F.D., and W.D.M. The children were placed in protective custody with the Kansas Department of Social and Rehabilitation Services (SRS). K.H. and D.M. were ordered to obtain psychological and substance abuse evaluations.

The children were adjudicated as children in need of care (CINC) on March 8, 1995, after the court accepted the statements of no contest by the parents' attorneys. The court made extensive findings of fact including that K.H. had twice before had her parental rights terminated. One of the children subject to a prior termination proceeding, H.A.M., is also subject to the present termination proceeding. Apparently, even though K.H. (but not D.M.) had been found to be unfit with regard to H.A.M., K.H. and D.M. concluded she was "not guilty," and thought it appro-

priate for H.A.M. to live with K.H. after she and D.M. began living together again.

The district court ordered the children to remain in SRS custody, and they were not allowed to return to the home of either parent without prior consent. The court also ordered the parents to complete psychological and substance abuse evaluations, commence active involvement in family therapy, and sign releases for all evaluations to be provided to the court.

The court conducted review hearings every several months over the next year and a half. On July 23, 1996, the State filed a motion for review and termination of parental rights.

On January 29, 1997, the Chickasaw Indian Nation became involved in the case. K.H. filed a motion for continuance and a motion for transfer of the case to the Children's Court, Court of Indian Offenses, Chickasaw Agency. The court heard K.H.'s motions on February 3, 1997. The court found all three children were Indian children as defined in the ICWA and its provisions would apply. Jay Watson, a representative of the Chickasaw Nation, desired to review the case files and the court took K.H.'s motion for transfer under advisement pending the tribe's review of the files and the determination of its position.

On March 3, 1997, the court conducted a status conference. Watson appeared and announced the tribe's intention to intervene. At the termination hearing, Watson testified he had been given the opportunity to have input in the direction of the proceedings and had assisted in the development of a new case plan in March 1997. The plan was described in the court's journal entry dated on March 11, 1997. On March 10, 1997, the State filed an amended motion for review and termination.

At the next status conference in May 1997, it was determined the parents had failed to comply with the case plan. Watson indicated the Chickasaw Nation supported SRS's motion for termination of parental rights since K.H. and D.M. had failed to comply with the case plan.

The trial court heard SRS's motion for termination in June 1997. On July 7, 1997, the court terminated the parental rights of D.M. and K.H. Both parents appeal and have filed individual briefs.

First, K.H. and D.M. argue the trial court erred in its failure to properly follow the notice provisions of the ICWA. K.H. requests a reversal of the trial court's order terminating her parental rights, a remand to the district court, and additional time to allow her to work with the tribe to reunite her family. We agree that the trial court failed to give timely notice, but under the facts of this case we do not find the error requires a reversal of the termination decision.

The Kansas Code for Care of Children, K.S.A. 38-1501 *et seq.*, recognizes the ICWA and the authority it gives Indian nations to intervene in a child in need of care proceeding. K.S.A. 38-1503(a) states: "Proceedings concerning any child who appears to be a child in need of care shall be governed by this code, *except in those instances when the Indian child welfare act of 1978 (25 U.S.C. §§ 1901 et seq.) applies.*" (Emphasis added.)

The ICWA was passed in 1978 in response to the increasingly high number of American Indian children who were being adopted by non-Indian parents and being raised apart from the cultural heritage that accompanies the special status American Indians occupy in this country. *Mississippi Choctaw Indian Band v. Holyfield*, 490 U.S. 30, 32-33, 104 L. Ed. 2d 29, 109 S. Ct. 1597 (1989). The stated purpose of the ICWA is to preserve the integrity of Indian tribes and to provide Indian tribes a means of intervening in cases involving the custody and/or possible termination of Indian parents' rights to their children. 25 U.S.C. § 1901 (1994); 25 U.S.C. § 1902 (1994). State court application of the federal protective measures of the ICWA is in furtherance of the State's duty to "preserve the unique cultural heritage and integrity of the American Indians." *Adoption of Riffle*, 277 Mont. 388, 393, 922 P.2d 510 (1996).

In any proceeding involving custody of a child of Indian heritage, the court must make a determination of whether the ICWA governs the proceeding. If a child is an enrolled member of a tribe or is the biological child of a member and is eligible for membership, the ICWA applies. 25 U.S.C. § 1903(4) (1994). The tribe's determination of membership or membership eligibility is conclusive

and final. *Adoption of Riffle*, 273 Mont. 237, 242, 902 P.2d 542 (1995), *appeal after remand* 277 Mont. 388, 922 P.2d 510 (1996).

Once a child is determined to be an Indian child as defined in the ICWA, the starting point of any child custody proceeding is 25 U.S.C. § 1912(a) (1994).

"In any involuntary proceeding in a State court, where the court knows or has reason to know that an Indian child is involved, the party seeking the foster care placement of, or termination of parental rights to, an Indian child shall notify the parent or Indian custodian and the Indian child's tribe, by registered mail with return receipt requested, of the pending proceedings and of their right of intervention. . . . No foster care placement or termination of parental rights proceeding shall be held until at least ten days after receipt of notice by the parent or Indian custodian and the tribe or the Secretary." 25 U.S.C. § 1912(a).

Several dates are important to the notice issue. No party disputes that the three children involved in this case are Indian children as defined in 25 U.S.C. § 1903(4). The CINC petition expressly stated: "The State has reason to believe that the children are of Indian descent." Yet, the State does not dispute that notice was not immediately given to the tribe.

The State filed a motion for termination of parental rights on July 23, 1996. There is no mention of the ICWA in the motion for termination or any evidence the tribe was given notice. At the termination hearing, Watson testified the children were "Indian children" as defined by the ICWA. Watson stated he was a qualified "Indian expert witness" in the courts of Iowa and Oklahoma and that the ICWA requires notice to the Indian tribe before any foster care proceedings are held. He testified the trial court's proceedings were not in compliance with the ICWA notice provisions.

Watson testified that he had no knowledge of the CINC proceedings until contacted by D.M. in January or February 1996. He stated the court or the court services officer contacted him sometime after D.M. contacted him. He also testified at the termination hearing that the Chickasaw Indian Nation had declined a transfer of the case to tribal court.

The CINC proceeding initiated by the State on November 4, 1994, was a "child custody proceeding" as contemplated in the ICWA. 25 U.S.C. § 1903 (1). Consequently, the trial court was

required to "notify the parent or Indian custodian and the Indian child's tribe, by registered mail with return receipt requested, of the pending proceedings and of their right of intervention." 25 U.S.C. § 1912(a). See *In Interest of J.W.*, 498 N.W.2d 417, 421-22 (Iowa App. 1993); see also *People ex rel. DSS in Interest of C.H.*, 510 N.W.2d 119, 124 (S.D. 1993) (a tribe's right to intervene is meaningless without notice of the proceedings). Therefore, the trial court erred in not giving notice to the tribe of the CINC proceedings.

There is some validity to the parents' argument that they were not given a meaningful opportunity to work with the Chickasaw Nation in an effort to preserve the family and that termination was almost a foregone conclusion by the time the tribe was properly notified. The issue is not raised by either party, but it appears the children were placed with non-Indian foster parents. One of the express purposes of the ICWA is the placement of Indian children "in foster or adoptive homes which will reflect the unique values of Indian culture." 25 U.S.C. § 1902; *In re H.D.*, 11 Kan. App. 2d 531, 532, 729 P.2d 1234 (1986).

The court in *In re H.D.* noted: "Violation of the Indian Child Welfare Act notice provisions may be cause for invalidation of the district court proceedings. 25 U.S.C. § 1914 (1982)." 11 Kan. App. 2d 531, Syl. ¶ 6. The court in *In re H.D.* also quoted from the Guidelines for State Courts in Indian Child Custody Proceedings, 44 Fed. Reg. 67.585-86 (1979), which states: " 'Proceedings in state courts involving the custody of Indian children shall follow strict procedures and meet stringent requirements to justify any result in an individual case contrary to these preferences [of keeping Indian children with their families].' " 11 Kan. App. 2d at 533. Although the trial court failed to give notice to the Chickasaw Nation, the error does not necessitate a reversal of this case due to subsequent actions by the court.

Prior to termination, Watson assisted in the development of a new case plan for K.H. and D.M. to permit the children to be returned to their home, and the tribe agreed the plan was appropriate. The Chickasaw Nation did not transfer the case to its jurisdiction, but intervened in the direction of the case. Considering

the Chickasaw Nation's involvement in this case, albeit belated, there was substantial compliance with the ICWA purpose of involving the tribe in the child care proceedings. Of great importance is the apparent belief by the Chickasaw Nation that the trial court remedied the initial failure to give notice with its subsequent actions.

Next, K.H. and D.M. argue there is insufficient evidence to terminate their parental rights.

Under the ICWA, before an Indian parent's or custodian's rights to a child can be terminated, a finding must be made that "active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful." 25 U.S.C. § 1912(d). Termination may be ordered only where the court is satisfied, beyond a reasonable doubt, supported by the "testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child." 25 U.S.C. § 1912(f).

The beyond a reasonable doubt standard in the ICWA's standard is obviously a stricter standard than that required under the Kansas Code for Care of Children, namely whether there is clear and convincing evidence of a parent's unfitness. K.S.A. 1997 Supp. 38-1583.

The federal standard has been interpreted by some state courts to require a dual burden of proof. First, the court must determine by clear and convincing evidence whether the state law provisions for termination are satisfied and then turn to the more stringent standard under the ICWA to determine whether the petitioner has proved beyond a reasonable doubt that custody by the natural Indian parent would likely result in damage to the child. *In re Bluebird*, 105 N.C. App. 42, 47, 411 S.E.2d 820 (1992). Other courts have determined that the federal standard adopted by the ICWA supplants the state standard and that the only criteria applicable are enumerated in 25 U.S.C. § 1912(f). See *People in Interest of C.A.J.*, 709 P.2d 604, 606 (Colo. App. 1985); *People in Interest of P.B.*, 371 N.W.2d 366, 371-72 (S.D. 1985).

The most practical approach is one adopted by North Carolina, which involves a two-step process, first applying the test established under state law for termination of parental rights, and then applying the standard of the ICWA. This approach does not require that the state law elements for termination be proved beyond a reasonable doubt. We believe this two-step approach is appropriate.

Under Kansas law, a finding of unfitness is a prerequisite to the termination of parental rights. *In re M.D.S.*, 16 Kan. App. 2d 505, 508, 825 P.2d 1155 (1992) (citing *In re J.G.*, 12 Kan. App. 2d 44, 51, 734 P.2d 1195, *rev. denied* 241 Kan. 838 [1987]). K.S.A. 1997 Supp. 38-1583(a) states the criteria for the termination of parental rights. It provides in part:

> "(a) When the child has been adjudicated to be a child in need of care, the court may terminate parental rights when the court finds by clear and convincing evidence that the parent is unfit by reason of conduct or condition which renders the parent unable to care properly for a child and the conduct or condition is unlikely to change in the foreseeable future."

Subsections (b) and (c) list the nonexclusive factors to be considered in making this determination. A finding of any one of the factors in K.S.A. 1997 Supp. 38-1583(b) and (c) is sufficient to establish grounds for terminating parental rights. K.S.A. 1997 Supp. 38-1583(e); *In re J.G.*, 12 Kan. App. 2d at 52. After a finding of unfitness, the court must then determine if the child can be returned in a reasonable amount of time and whether the termination of parental rights is in the best interests of the child. *In re S.M.Q.*, 247 Kan. 231, 232, 796 P.2d 543 (1990); *In re N.D.G.*, 20 Kan. App. 2d 17, 21, 883 P.2d 89, *rev. denied* 256 Kan. 995 (1994). The court must give "primary consideration to the physical, mental or emotional condition and needs of the child" when considering whether to terminate parental rights. K.S.A. 1997 Supp. 38-1583(e).

The standard of review in a termination case is whether the record establishes substantial competent evidence to support the trial court's findings. *In re S.M.Q.*, 247 Kan. at 234. Substantial evidence has been defined as evidence which a reasonable person might accept as being sufficient to support a conclusion. *In re J.D.D.*, 21 Kan. App. 2d 871, 874, 908 P.2d 633 (1995). The ap-

pellate court does not make a determination as to whether the evidence contained in the record was clear and convincing in nature. See *In re D.V.*, 17 Kan. App. 2d 788, 792, 844 P.2d 752, *rev. denied* 252 Kan. 1092 (1993).

Furthermore, an appellate court generally must not reweigh the evidence, substitute its evaluation of the evidence for that of the trial court, or pass upon the credibility of the witnesses. It must review the evidence in the light most favorable to the party prevailing below. *In re S.M.Q.*, 247 Kan. at 234; *In re D.V.*, 17 Kan. App. 2d at 792.

In determining that K.H. and D.M. were unfit, the trial court found the following K.S.A. 1997 Supp. 38-1583(b) factors to exist: (b)(7) reasonable efforts by appropriate public or private child caring agencies have been unable to rehabilitate the family; and (b)(8) lack of effort on the part of the parents to adjust their circumstances, conduct, or conditions to meet the needs of their children. There was substantial competent evidence to support the court's finding.

In determining that parental rights should be terminated pursuant to the ICWA, the trial court found the following factors to support its decision that beyond a reasonable doubt there was significant risk of harm to the children if returned to K.H. and D.M.;

1. The therapists for the children have clearly indicated the impact these parents have had psychologically on H.A.M. and J.F.D.

2. H.A.M. and J.F.D. have been physically harmed by the parents or with the knowledge and complacency of the parents.

3. The parents have not taken the necessary steps to improve the situation, although provided time to do so.

4. The parents have shown a disturbing lack of judgment in allowing a parent found to be unfit to be placed in a position of parenting the same child to whom parental rights had been terminated.

5. The parents have displayed a willingness to ignore court orders to fulfill their own needs while ignoring the needs of the children.

K.H. objects to the trial court's reliance on a psychological evaluation completed in March 1995. She argues the trial court erred

in admitting the evaluation, over her objection, as evidence at the termination hearing. K.H. states that the evaluation was based on a 1-hour interview she had with Sandra Sims and that at the termination hearing Sims repeatedly testified that she could not remember the specifics of the evaluation or the sources of information she used in formulating her opinions. K.H. claims Sims' inability to remember the specifics rendered her unavailable for cross-examination and violated her right to confront the witness.

K.H. also argues the testimony of the children's therapists was not credible and should be disregarded. K.H. claims Joyce Kyle, J.F.D.'s therapist, was less than an unbiased therapist. She states Kyle started therapy with J.F.D. under the assumption that he had been abused and she exerted great influence over him to persuade him that he had been abused. K.H. also states that Barbara Holt-Williams' contact with H.A.M. was minimal. She claims Holt-Williams testified that H.A.M. was prone to lying and that Holt-Williams received a majority of her information from H.A.M.

K.H. argues the trial court incorrectly found that she and D.M. had not taken the steps to improve the situation and had displayed a willingness to ignore court orders. She argues they substantially complied with the court's orders. She claims the only two orders she failed to comply with were to remain in therapy and to complete a parenting class for children with attention deficit hyperactive disorder (ADHD). K.H. downplays the need for ADHD classes. She also states she tried to find a compatible therapist but could not. Money was also a factor. She indicates her financial situation caused her to not pay her child support.

Last, K.H. takes issue with the trial court's finding that she and D.M. showed a lack of judgment in allowing her to live with H.A.M. when her parental rights had already been terminated. K.H. insists SRS created the untenable situation with H.A.M. by only terminating K.H.'s parental rights at the time, while leaving D.H.'s rights intact. She states, "It certainly is not unheard of for estranged couples to reunite, particularly when children are involved."

D.M. argues that he substantially complied with the court orders early in the proceedings and that SRS failed to carry out the stat-

utory charge to try and reintegrate the children with the parents when possible. D.M. claims that Kim Scheer's unilateral decision to request a cessation of visitation between him and H.A.M. caused a breakdown of their relationship.

D.M. also alleges he and K.H. were getting along well with W.D.M. and visitations seemed to go well. He contends the court failed to recognize it could find him unfit to have the custody of his oldest child, H.A.M., while remaining fit to have his younger child, W.D.M. D.M. concludes the trial court had ample evidence to find he was fit to have both children.

The testimony at the termination hearing was lengthy. The trial court heard testimony of 13 witnesses over a period of 5 days.

Kim Scheer testified the parents and children were provided therapy, an SRS program support worker was provided, and several case plans were developed identifying tasks the parents could accomplish to assist with the court orders. Referrals had been made for the benefit of the family to assist them in receiving professional help and guidance in complying with the court orders, and the children were placed in foster homes.

Scheer stated that K.H. was ordered into individual therapy but was not currently in therapy and that she had provided no verification that she had completed the court-ordered ADHD parenting classes. She had not completed any age-appropriate parenting classes, failed to pay child support, refused to sign a consent for W.D.M. to receive the court-ordered developmental evaluation, and focused her energies on her anger with SRS, the court, and all others providing assistance instead of on participating in therapy and cooperating with the court.

Scheer testified that D.M. physically abused his children, failed to pay child support, failed to participate fully in individual therapy, failed to complete age-appropriate parenting classes for J.F.D., did not submit an income tax return as ordered, failed to provide any AA or NA verification, failed to submit to random urinalysis, and also focused his energies on his anger with SRS, the court, and all others providing assistance instead of on participating in therapy and cooperating with the court.

Watson testified that K.H. and D.M. failed to comply with the case plan instituted with his input which would have ensured the correction of the conditions that led to the initial removal. He also opined that termination of parental rights would be in the best interests of the children.

Laura Almquist-Parks testified that D.M. failed to provide verification for attendance at NA meetings, failed to comply with court-ordered ADHD parenting classes, claimed he had a therapist but would not disclose the name, and failed to submit to random urinalysis. Almquist-Parks also testified that K.H. did not provide verification that she was in therapy.

Joyce Kyle testified that she was J.F.D.'s therapist and had seen him every other week for the last couple of years. She testified that her play therapy with J.F.D. indicated he had been traumatized. Kyle testified that J.F.D. told her that his parents had locked him in a dark closet with his sister and that he was afraid of D.M. Kyle also testified that J.F.D. indicated he and H.A.M. had been beaten with a belt by D.M. and D.M. had tied him to his bed for many hours at a time. J.F.D. told Kyle that K.H. knew what was happening.

Almquist-Parks, a psychologist, testified that K.H. and D.M. cannot sufficiently meet the needs of their children. Polly Freeman, a social worker, testified that termination was appropriate because of the longevity of the case, the parents' lack of resolve in regards to abuse issues, and the need of the children to have a permanent home. Kyle, also a social worker, testified that she opposed returning the children to the custody of K.H. and D.M. because they would not admit the seriousness of their mistakes. She opined that by not admitting their mistakes, there was a serious risk for additional abuse.

K.H.'s claims that the 1995 evaluation lacked credibility, that Kyle was not an unbiased therapist, and that Holt-Williams did not have enough contact with H.A.M. to render a proper opinion were all issues brought to the attention of the trial court. The court weighed the evidence presented and found the testimony of the State's witnesses to be credible.

The testimony of witnesses at the termination hearing also supported the trial court's finding, beyond a reasonable doubt, that returning the children to the custody of the parents would result in serious emotional or physical damage to the children.

Under both the Kansas clear and convincing standard and the ICWA beyond a reasonable doubt standard, the trial court did not err in terminating the parental rights of D.M. and K.H.

Affirmed.