NOT DESIGNATED FOR PUBLICATION

No. 125,170

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interest of H.A.,
A Minor Child.

MEMORANDUM OPINION

Appeal from Butler District Court, JOE E. LEE, magistrate judge. Opinion filed January 6, 2023. Affirmed.

*Lucy C. Hesse*, of Wichita, for appellant natural mother.

*Cheryl M. Pierce*, assistant county attorney, for appellee.

Before ARNOLD-BURGER, C.J., GARDNER and CLINE, JJ.

PER CURIAM: R.L. (Mother) appeals the district court's decision terminating her parental rights to her biological child H.A. Mother does not challenge the district court's findings under Kansas law that she was unfit as a parent, that her unfitness was unlikely to change in the foreseeable future, or that termination was in H.A.'s best interests. Instead, Mother challenges only two determinations under the Indian Child Welfare Act (ICWA), 25 U.S.C. § 1901 et seq. (2018): that the State made "active efforts" to reunify the family, and that the evidence proved beyond a reasonable doubt that her continued custody of H.A. will likely result in serious emotional or physical harm to H.A. See K.S.A. 38-2203(a). Having reviewed the record, we find no error.

1

*Factual and Procedural Background*

In November 2016, the State filed a child in need of care (CINC) petition for two of Mother's children—H.A. and her sister—based on Mother's drug use. H.A.'s sister tested positive for methamphetamine at birth. H.A. was removed from Mother's custody but was reintegrated with Mother by September 2018. As a part of its order restoring Mother's custody, the district court ordered that H.A. have no visitation with Father unless he obtained a court order allowing visitation. Mother flouted that order, however, by allowing H.A. to visit and eventually live with Father.

*Current CINC Case*

The State filed a second CINC petition for H.A. after her school reported that she had seven unexcused absences. The petition alleged that the school accommodated H.A.'s being picked up outside her home, yet Mother failed to get H.A. on the bus. If H.A., who has autism, continued to miss school, she risked losing the services provided through her individualized education program (IEP).

The State amended its petition to include allegations of H.A.'s inappropriate sexual conduct at school, which the school also reported to the Kansas Department for Children and Families (DCF). According to the petition, H.A., then ten or eleven years old, was "exhibiting behaviors at school such as pulling another male student's pants down and taking off her bra in class." H.A. also drew a picture of a naked cartoon character, "checking panties . . . [and] kissing."

That same week the initial petition was filed, police executed a search warrant for the house that H.A. lived in with Father, which Mother did not live in but often frequented. Father was the primary target of the search warrant. Although Mother was not present during the search, she and a man living in the backyard of the home were the

2

secondary targets of the search warrant. Sergeant Sam Humig took several pictures of the home during the search, showing the house was cluttered, dirty, and contained hazardous materials. Officers also discovered what they believed was drug paraphernalia and methamphetamine.

The district court adjudicated H.A. a CINC in December 2020. The district court also found sufficient evidence—based on H.A.'s paternal lineage—that H.A. was an Indian child, as defined in the ICWA. The district court approved placement for H.A. with a non-Indian foster family, however, finding H.A. had been placed with the same family in an earlier CINC case and the family was familiar with H.A.'s autism diagnosis. In February 2021, the district court entered a disposition order that found H.A. eligible to be enrolled as a member of the Comanche Nation. It noted that the Comanche Nation had approved H.A.'s placement with the non-Indian foster home because of her specific needs and autism diagnosis.

The court set Mother's case plan goal as reintegration and found that public and private agencies made reasonable and active efforts to facilitate the permanency plan. The court found that TFI Family Services (TFI) was "actively engaging [M]other in the case plan" and "attempted on multiple occasions to contact" her. And although TFI was "sometimes successful," it was usually unable to reach Mother. The court also ordered Mother to submit to two consecutive urine analysis (UA) tests with negative results before she could start visitations with H.A. The court also ordered Mother to get a drug and alcohol evaluation and follow the recommendations.

*Termination Proceedings*

But after a permanency hearing in June 2021, the district court determined that reintegration was no longer a viable goal. The court found clear and convincing evidence that Mother's continued custody of H.A. was likely to cause serious emotional or physical

damage. The district court explained that H.A. lacked parental participation and a safe and stable environment suitable for her special needs. The district court also found that Mother was not submitting to any drug testing, that this was the second time that H.A. had been removed from Mother's custody, and that this case had been open since December 2020, yet Mother had made little progress in her case plan tasks.

The State moved in December 2021 to find Mother and Father unfit and to terminate their parental rights. Relying mainly on Mother's drug use and her failure to complete case plan tasks, the State argued many reasons to terminate her parental rights. These reasons included Mother's use of intoxicating drugs in excess and in a nature or duration that rendered her unable to care for H.A.'s physical, mental, or emotional needs, see K.S.A. 2020 Supp. 38-2269(b)(3), and Mother's physical, mental, or emotional neglect of H.A., see K.S.A. 2020 Supp. 38-2269(b)(4). The State also alleged that Mother was presumptively unfit under K.S.A. 2020 Supp. 38-2271(a)(5) because H.A. been in an out-of-home placement for more than a year and Mother had substantially neglected or willfully refused to carry out a reasonable reintegration plan.

At the termination hearing, many witnesses testified. In addition to the four case managers who tried to help Mother complete her case plan tasks, these witnesses also testified: the officer who searched and photographed H.A.'s home, two DCF investigators, a therapist that Mother first started seeing in January 2022, the program director for a substance abuse treatment at South Central Mental Health who conducted Mother's drug assessment in January 2022, the CEO of City on a Hill (another substance abuse facility in which Mother was an inpatient from August 23, 2021, to September 19, 2021), Mother's sister-in-law, the Indian Child Welfare Advocate for the Comanche Nation and the Director of Indian Child Welfare (an expert designated by the Comanche Nation).

4

Mother and her sister also testified. Mother testified that in November 2020, she lived in Arkansas City with friends. She came to live there because the car she was riding in broke down there. She began gambling and developed a gambling addiction. While living in Arkansas City, Mother would drive to H.A.'s Father's house in El Dorado, over 60 miles away, each morning to take H.A. to school. When Mother did not make it to Father's house, H.A. missed school.

From November 2020 to May 2021, Mother made little if any progress in her case plan tasks. But in May 2021, Mother checked herself into an addiction facility in Wichita (Miracles) before discharging herself a few days later. After that, she attended treatment at Four County Mental Health in Winfield for over two months. Four County referred Mother to City on a Hill for inpatient treatment and Mother stayed there until September 2021. She then moved to Wichita for a few months before finally moving in with her sister in El Dorado in late December 2021.

Between January 2022 and the termination hearing in April 2022, Mother made significant progress in her case plan. She completed a drug and alcohol assessment and finally submitted to regular UA testing, which showed Mother was no longer using drugs. She failed a hair follicle test in January but passed one in March. Mother also started having visits with H.A. and had ten total visits by the termination hearing. Mother also continued attending drug and alcohol abuse treatment and therapy through South Central Mental Health in El Dorado after leaving City on a Hill. She also completed several parenting classes and found a job at McDonalds to begin the week after the termination hearing. Mother also testified that her application for public housing had recently been accepted.

Consistent with Mother's testimony, the State's evidence generally showed that Mother waited until January 2022 to make any serious efforts toward reintegration. From December 2020 through December 2021, Mother failed to take all but one of her

5

scheduled drug tests, twice tested positive for amphetamines and methamphetamine, never progressed to visitations, communicated infrequently and sporadically with most of her case managers, and generally ignored requests to disclose her address. Mother also failed to obtain employment or secure housing in that time. She spent some of this time in jail. Mother also became pregnant by her boyfriend, who also struggled with drug addiction issues and was a party to a separate CINC case.

Evelyn Turner, the expert witness, testified that the State made reasonable and active efforts to reunite H.A. with Mother but those efforts failed. She also testified that Mother's continued custody of H.A. was likely to result in H.A.'s serious emotional or physical damage. Turner recommended terminating Mother's parental rights.

Mother presented evidence of her treatment at various treatments centers, which she claimed started in May 2021. Mother generally accepted blame for missing various drug tests and case plan meetings, but also suggested that at times she was unable to get to her appointment because she lacked transportation.

Calling Mother's likelihood of maintaining her sobriety into question, the State elicited testimony from Miranda Unruh, CEO of City on a Hill, showing City on a Hill staff had wavering confidence in Mother's ability to stay sober. Mother's discharge paperwork provided the following prognosis: "Guarded. Due to the fact that the client chronically relapses and needs to have a solid, sober, network in place for when she is struggling." These documents also stated that Mother "never established a sober social network or attended meetings on a regular basis in the past. She has been informed by this staff that this is absolutely necessary if she wants to succeed at obtaining long term sobriety." Also, "[Mother] will not be returning to the area that she was living in while using. She is going to live with her boyfriend, who is also in recovery, and will not tolerate anyone using in his life at this time. His parents are supportive of the client as well, as long as she is not using."

Unruh also testified that City on a Hill recommended to Mother that she attend outpatient treatment after her stay there. The recommendation summary stated that Mother was "scheduled to attend Four County Mental Health on September 28th . . . for mental health and substance abuse disorder services." Mother testified that she had no transportation to attend this meeting because of her recent move to Wichita.

*District Court's Ruling*

After considering the evidence, the district court granted the State's motion and terminated Mother and Father's parental rights in April 2022. It concluded that Mother was unfit and that condition was unlikely to change in the foreseeable future. Applying ICWA standards, the district court also found that the State made active yet unsuccessful efforts to reunify the family. And the district court found beyond a reasonable doubt that Mother's continued custody of H.A. was likely to result in serious emotional or physical damage to H.A. The district court also applied a presumption of unfitness under K.S.A. 2020 Supp. 38-2271. The district court noted, however, that even absent this presumption, the evidence supported termination beyond a reasonable doubt. And finally, the district court found termination was in H.A.'s best interest.

Mother appeals. Father does not.

*The District Court Properly Complied with ICWA Requirements When Terminating Mother's Parental Rights to H.A.*

Mother does not dispute the general law that applies to her case. Kansas courts use a two-step approach for termination of parental rights cases involving an Indian child: (1) applying the state law test for terminating parental rights set forth in K.S.A. 38-2269; and (2) applying ICWA standards. See *In re L.M.B.*, 54 Kan. App. 2d 285, 297-98, 398

7

P.3d 207 (2017); *In re H.A.M.*, 25 Kan. App. 2d 289, 295-96, 961 P.2d 716 (1998). Mother does not appeal any state law issues. Rather, she challenges only the sufficiency of the evidence supporting the district court's termination decision under ICWA. We thus do not address the sufficiency of the evidence under Kansas law. See *In re L.M.B.*, 54 Kan. App. 2d at 298.

Mother focuses her appeal on two specific rights governing the termination of parental rights of Native American children under ICWA. See *In re M.F.*, 290 Kan. 142, 148-49, 225 P.3d 1177 (2010). First, ICWA requires a showing that "active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful." 25 U.S.C. § 1912(d) (2018). Second, ICWA requires "a determination, supported by evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child." 25 U.S.C. § 1912(f). This is a higher burden than the Revised Kansas Code for Care of Children's clear and convincing evidence standard under our state's law. *In re M.F.*, 290 Kan. at 149-50. ICWA does not elaborate on these requirements, but federal regulations mandate certain procedures for state courts to follow in Indian child-custody proceedings. See 81 Fed. Reg. 38,778 (June 14, 2016); see 25 C.F.R. §§ 23.101-144 (2020). Mother contends these requirements were not met here.

1. *Clear and Convincing Evidence Supports the District Court's Finding that the State Made Active Efforts to Reunify the Family*

Mother first argues that the State did not make active efforts to reunite her family as ICWA requires. Mother challenges the district court's factual findings as insufficient and its conclusion as unsupported.

Because "[n]either ICWA nor its regulations provide the standard of proof required for the State to prove it made active efforts at reunification" and the Department of the Interior, through the Bureau of Indian Affairs, has specifically declined to establish such a standard, this court applies a clear and convincing standard. *In re E.L.*, No. 123,590, 2021 WL 5501578, at *8 (Kan. App. 2021) (unpublished opinion) (citing 81 Fed. Reg. at 38,791), *rev. denied* 315 Kan. 968 (2022). "Thus, we ask whether, after reviewing all the evidence in the light most favorable to the State, we are convinced that a rational fact-finder could have found the district court's determination to be highly probable." 2021 WL 5501578, at *8 (citing *In re L.M.B.*, 54 Kan. App. 2d at 304).

In making this determination we use the federal regulations' definition of "active efforts":

> "Active efforts means affirmative, active, thorough, and timely efforts intended primarily to maintain or reunite an Indian child with his or her family. Where an agency is involved in the child-custody proceeding, active efforts must involve assisting the parent or parents or Indian custodian through the steps of a case plan and with accessing or developing the resources necessary to satisfy the case plan. To the maximum extent possible, active efforts should be provided in a manner consistent with the prevailing social and cultural conditions and way of life of the Indian child's Tribe and should be conducted in partnership with the Indian child and the Indian child's parents, extended family members, Indian custodians, and Tribe. Active efforts are to be tailored to the facts and circumstances of the case. . . ." 25 C.F.R. § 23.2 (2020).

As the State correctly notes, "active efforts" does not mean "absolutely every effort." Still, as the guidelines state, "'active efforts' means something more than the 'reasonable efforts' standard that may apply in non-Indian-child termination proceedings." *In re L.M.B.*, 54 Kan. App. 2d at 304 (addressing the State's showing of failure of reasonable efforts to rehabilitate the family at termination hearing); compare K.S.A. 2020 Supp. 38-2269(b)(7). "This [reflects] congressional intent—by its plain and ordinary

9

meaning, 'active' cannot be merely 'passive.'" 81 Fed. Reg. at 38,790. We determine the sufficiency of "active efforts" on a case-by-case basis, and "[t]he minimum actions required to meet the 'active efforts' threshold will depend on unique circumstances of the case." 81 Fed. Reg. at 38,791.

The guidelines list 15 examples of active efforts. Of these 15 examples, only "post-reunification services" is irrelevant here since no reunification occurred. 80 Fed. Reg. 10,146, 10,150 (2015). The remaining examples generally fall into two categories: (1) active efforts to involve the children's tribe and extended family members to assure that the children's Indian culture is protected and respected and (2) active efforts to keep the family together and help the parents obtain necessary resources.

A. *Sufficiency of the District Court's Findings*

Mother first asserts that the district court's findings lack enough detail to satisfy 25 C.F.R. § 23.120(b) (2020), which states:  "(b) Active efforts must be documented in detail in the record."

In determining that the State had made active efforts to reunite H.A. with Mother, the district court found:

> "Through the testimony of TFI representatives Melissa Melsoni, Kathy Schmidt, Rae Marcy, and Adrianna Lyman, the Court found that there were reasonable and active efforts expended by the Agency. TFI representatives testified to countless time[s] they attempted to communicate with both parents and parents['] lack of communication in response to the agency. . . . TFI has had limited communication with Mother over the majority of the case and Mother has failed to provide TFI with updated contact information, including phone number and address."

Mother claims that the regulation requires the district court's written decision to reference the specific factors it relied on. Yet Mother shows us no legal authority requiring a court's written decision to do so and we have found none. To the contrary, our court rejected a similar claim in *In re M.K.*, No. 113,961, 2015 WL 9459829, at *5 (Kan. App. 2015) (unpublished opinion). See also *Matter of Welfare of A.L.C.*, 8 Wash. App. 2d 864, 876, 439 P.3d 694 (2019). Because nothing in ICWA requires that a court's finding of active efforts contain specific language or take a specific form, Mother's argument is legally unsupported.

The plain language of the regulation requires documentation in detail in the record. Active efforts were detailed in the record here, as underscored by the district court's summary of testimony, above, and that is sufficient. Many agency employees testified to their efforts, and expert witness Turner testified that their efforts were "active efforts" as ICWA requires. And the district court made extensive findings about the reasonable and active efforts by the State when announcing its decision at the end of the termination hearing. Any lack of detail in its written decision is not error.

B. *Sufficient Evidence Supports the District Court's Conclusion that the State made "Active Efforts"*

Mother next claims that the record fails to support the district court's conclusion that the State made active efforts. Mother mainly challenges the adequacy of her four case managers' efforts individually and collectively. We thus review the record in detail.

*Melissa Melsoni*

Most of Mother's claims focus on Melsoni—Mother's case manager from November 24, 2020, to October 1, 2021. Mother argues that Melsoni failed to promptly recognize that Mother needed help with transportation and never appropriately addressed

11

that issue. And Mother suggests that Melsoni was at least partly at fault for their limited communication. Finally, Mother claims that Melsoni advocated against starting visits in September 2021, based on her understanding that the case was already headed toward termination, before the State moved for termination.

Melsoni was assigned to Mother's case at the first court hearing in November 2020 but could not locate Mother until December 18, 2020, when police arrested her. That day, Melsoni received a call from Assured Occupational Solution, saying that Mother refused to complete a required drug test. Melsoni spoke to Mother and convinced her that she should take the test as the first step toward gaining visitation with H.A. After receiving the results of that drug test, Melsoni called Mother and left a detailed message for Mother to call her back. Mother eventually returned this call and discussed the results of the test with Melsoni. Because Mother claimed that the test was inaccurate because of an alleged kidney problem, Melsoni directed Mother to contact the testing facility and to provide a doctor's note. But Mother did not comply with those directions.

Even after multiple requests, Mother did not provide TFI with a home address until September 2021. Mother generally told Melsoni that she was not going to stay at her current location for long and gave Melsoni Father's address in El Dorado, despite her not living there. Mother also consistently changed her phone number. During her service as Mother's case manager, Melsoni tried many times to talk with Mother about her reintegration plan. Mother would sometimes respond, but at other times Mother would disappear for significant periods of time without contacting Melsoni.

Melsoni called and left voicemails for Mother twice in mid-January 2021, yet got no response. In February, Melsoni added Mother to the "UCI color testing" drug tests in Wichita at Mother's attorney's request and called and texted Mother to see why she was not attending her scheduled drug tests. Mother responded in March but did not, however, attend her drug tests, claiming that she could not do so because she was in Oklahoma and

would soon be moving there. Another time, she claimed that she could not submit to testing because she tested positive for COVID-19 and had to quarantine. Although Melsoni requested a doctor's note, Mother did not provide one.

Melsoni left Mother another voicemail at the end of March 2021 and five days later received a call that Mother was in jail in Kansas. Melsoni called Mother twice in April 2021 and left long voicemails but received no response. Then, on May 4, Melsoni called to confirm that Mother would attend her next case plan meeting. Mother told Melsoni that she would and that she also planned to attend inpatient treatment at Miracles in Wichita. Mother checked herself into Miracles on May 6 but checked herself out five days later. Melsoni texted and emailed Mother on May 17 and rescheduled Mother's missed case plan meeting.

Melsoni spoke with Mother again on May 26. During this conversation, Mother told Melsoni that she did not have a vehicle and her license was suspended. Melsoni responded:

> "'The last time we were in court, you insisted that you could take your drug testing in Wichita. The judge ordered that you be added to the color system, and that happened immediately following court. Not once have you reached out to me in the last few months, to discuss drug testing or why you're not attending drug testing. . . .
> "'It has also been reported that you have checked yourself out of inpatient rehab. I will work to see if you can complete your drug test in Ark City; however, you should have contacted me sooner than now if you did not have a car or a way to get there. You also should have not . . . stated in court that you could go take your drug test in Wichita."

The evidence does not suggest transportation was the barrier to Mother's completing these tasks. And it shows that Mother had not made Melsoni aware of any transportation problem.

Melsoni and Mother spoke again on May 28, and Mother claimed that she had given Melsoni's contact information to her outpatient treatment manager, although at that time Mother did not give the name of the outpatient treatment facility to Melsoni. But no one from the outpatient treatment facility ever contacted Melsoni. Throughout July and early August, Mother and Melsoni played phone tag but had very little contact. For example, Melsoni contacted Mother regarding a missed drug test on July 1, but Mother did not respond. Mother then called Melsoni on July 8 to provide contact information for a kinship option for placement, but during this conversation, Mother would not explain where she was or what she was doing. Mother called Melsoni from a new phone number on July 14. Melsoni returned this call and left a voicemail but never received a response. The same thing occurred the next week. And on August 1, Melsoni called and texted Mother in response to a text from Mother that she had missed, but Mother never followed up.

On August 12, Melsoni learned that Mother had been in court in Butler County. Melsoni reached out to Mother and asked her to disclose the current criminal charges against her, but Mother never fully did so. Mother eventually provided Melsoni with information about some of the charges against her but gave no details about them.

Mother's attorney contacted Melsoni on August 31, stating Mother had been admitted to inpatient rehabilitation at City on a Hill in Sedan. About two weeks later, Mother and her therapist called Melsoni to discuss visitation. During this phone conversation, Melsoni learned that Mother was pregnant. Mother also demanded visitation with H.A. Mother had apparently advised her therapist that she had submitted to two consecutive UA's with negative results. But Mother had neither taken any UA tests with her nor completed any UA's while at City on a Hill. Melsoni responded to Mother's demands by reminding her that the district court had found reintegration unworkable and had even denied video visits. Mother responded angrily and left the conversation. When

14

Melsoni texted Mother that same day to confirm Mother's pregnancy, Mother told Melsoni that the father had an open CINC case in Sumner County.

Mother later contacted Melsoni to let her know she was leaving City on a Hill. Although Mother told Melsoni that she had moved to an apartment in Wichita, Mother refused to give Melsoni her address. Melsoni directed Mother to complete a drug test in El Dorado. Mother refused to do so but provided a urine sample for testing at a facility in Wichita. When Melsoni rejected that test and again asked Mother to take the test in El Dorado, Mother complied and completed the testing that day.

The next day, Melsoni sent Mother a text explaining that the district court had entered an order finding reintegration was no longer viable, so visitation was no longer an option. Melsoni explained:

> "This was because of [H.A.]. She had gone almost a year, at this point, with no visitations with her mother. Her behaviors were under control, she was doing a lot better, and it was just important for that to maintain.
> "We were very afraid—everyone that we consulted and spoke with— that starting visits would cause some of those behaviors to start again. And . . . we . . . didn't want to cause any confusion for her because, again, [H.A.] has very extreme autism, and she does not handle certain things well."

The record refutes Mother's claim that Melsoni should be blamed for the inconsistent communication between herself and Mother. Melsoni's testimony establishes that she repeatedly made reasonable attempts to contact and stay in contact with Mother. Mother inhibited Melsoni's ability to address her transportation issues by not giving Melsoni timely notice of that problem. True, Melsoni refused to let Mother pursue visitation before a final termination decision and after having evidence that Mother had completed inpatient drug treatment. But at that time, the district court had granted discretion over visitation to TFI so Melsoni no longer had the authority to unilaterally

15

direct Mother toward visitation with H.A. Rather, she had to follow court orders, such as requiring Mother to provide two consecutive clean UA's to begin visitation.

As recognized in *In re E.L.*, 61 Kan. App. 2d 311, 337-38, 502 P.3d 1049 (2021), *rev. denied* 315 Kan. 968 (2022), "courts have held a 'parent's demonstrated lack of willingness to participate in services may be considered in determining whether the State's efforts were adequate' under ICWA." Mother's unwillingness to participate in the services that Melsoni tried to provide does not detract from evidence showing that Melsoni made reasonable and active efforts toward reunification.

### Kathy Schmidt

Mother argues that Schmidt failed to address why there was a lack of communication from Mother and that Schmidt's efforts were merely "passive."

But Schmidt was Mother's case manager for only a short time—from the beginning of October 2021, until December 2021. Schmidt made several attempts to stay connected with Mother, but Mother was inconsistent in responding. Schmidt also set up around eight drug tests for Mother, yet Mother failed to show up for any of them. And Schmidt made active efforts to involve the children's tribe to assure that the children's Indian culture was protected and respected by: (1) communicating with the Comanche Nation about the change in the tribe representative assigned to H.A.'s case; and (2) submitting a report for the permanency hearing on December 14, 2021. Schmidt's acts, viewed collectively, show active efforts toward reunification.

### Aurelia Marcy

Next, Mother argues that Marcy did not address Mother's transportation issues or make enough efforts to engage the Comanche Nation.

16

But Marcy was Mother's case manager for only a couple of weeks in December 2021. Marcy characterized her overall ability to communicate with Mother as sporadic. Still, Marcy spoke to Mother at least twice during those two weeks. And at Mother's direction, Marcy set up a drug test for Mother, which Marcy believed Mother completed.

Marcy acknowledged that Mother told her that she had no transportation. But Mother made that statement when telling Marcy she wanted a friend to drop off presents for H.A. at the El Dorado office. Mother never told Marcy she lacked transportation to her drug testing or other court-ordered obligations. Viewed in context, the record does not suggest that Marcy failed to contact Mother or made only passive efforts to avoid a family breakdown.

### Adrianna Lyman

Lyman was Mother's case manager from December 30, 2021 to April 5, 2022—the few months before termination of Mother's parental rights on April 12. Mother's recitation of her interactions with Lyman suggests that although Lyman may have made better efforts than her previous case managers, Lyman still did not spend enough time on her case.

But Mother mistakenly interprets Lyman's testimony that she had not worked with Mother long enough "to speak on parental rights," to mean that Lyman made insufficient efforts toward reunification. Lyman testified that when working with Mother she had told Mother she had the potential to be a good influence on H.A. if she continued with sobriety and stability. But Lyman was not around Mother enough to speak to parental rights at that time.

Still, at the time of the hearing, Lyman was concerned with Mother's pattern of relapse after sobriety and recommended termination of her parental rights. Even after

17

Mother was discharged from City on a Hill drug and alcohol treatment, she refused to comply with requested drug testing and missed many drug tests. Mother went months with no outpatient treatment and showed a propensity to return to her drug of choice—methamphetamine. Lyman found it problematic that Mother waited until after the termination of parental rights hearing was scheduled to start complying with requests for drug testing. And Lyman could not predict when Mother would achieve stability so she could have H.A. in her home. H.A.'s life had been full of trauma, yet H.A. could not fully communicate. Over the several years that H.A. was out of Mother's care, she continued to show progress. Lyman was not confident that three more months would be enough to show a level of stability that would prevent H.A. from being at risk of further trauma. Delaying permanency to see whether Mother would achieve and maintain stability was not in H.A.'s best interests.

Lyman managed to stay in constant contact with Mother—something every case manager could have done had Mother reasonably responded to them. And Lyman was able to identify and address several of Mother's problems. For example, after Mother started having visits with H.A., Lyman addressed concerns about Mother's focus on her phone and her failure to give H.A. nutritious foods. Lyman transported Mother to in-person visits with H.A., which took up to 10 hours. She then facilitated other visitation options. Mother also consistently submitted to drug testing after Lyman "ordered drug compliance." But Mother still had not been successfully discharged from drug and alcohol services, or from mental health services, as her plan required. And successful discharge from those services was essential to show Mother's commitment to sobriety. Nor had Mother provided the required documentation of her ongoing criminal cases. Lyman was also concerned about Mother's ability to meet H.A.'s needs after Father's rights were terminated and Mother was the only remaining parent. Mother would have a new baby and would still be recovering from her drug addiction issues.

Lyman repeatedly consulted the Comanche Nation to discuss visitation and other basic CINC matters for Mother. Lyman got a list of father's extended family members for possible placement from the Comanche Nation Indian Child Welfare Advocate whose job it was to assure H.A.'s case complied with ICWA. Although the goal was to place H.A. with an Indian family, that never occurred, likely because of H.A.'s special needs. Yet the Indian Child Welfare Advocate still believed that the State had made active efforts to reunite the family.

Lyman's testimony shows that she made active efforts to reunite the family. See, e.g., 25 C.F.R. § 23.2(2) ("Identifying appropriate services and helping the parents to overcome barriers, including actively assisting the parents in obtaining such services"); 25 C.F.R. § 23.2(2)(7) ("Supporting regular visits with parents or Indian custodians in the most natural setting possible as well as trial home visits of the Indian child during any period of removal, consistent with the need to ensure the health, safety, and welfare of the child"); 25 C.F.R. § 23.2(2)(8) ("Identifying community resources including housing, financial, transportation, mental health, substance abuse, and peer support services and actively assisting the Indian child's parents or, when appropriate, the child's family, in utilizing and accessing those resources").

But, contrary to Mother's implication, the success of Lyman's efforts does not mean that other case workers' unsuccessful efforts were merely passive. Rather, Mother waited more than a year to make any significant efforts of her own, then did so when Lyman was her case worker, likely motivated by the motion to terminate her parental rights. The record shows that the case managers' efforts, viewed collectively, were reasonable and active under the circumstances. See 81 Fed. Reg. at 38,791 (sufficiency of "active efforts" determined case-by-case).

19

*Expert witness Evelyn Turner*

Finally, Mother argues that although Turner—the Comanche Nation's designated expert—testified that the State had made reasonable and active efforts toward integration, she failed to explain her opinion, thus implying it should be disregarded.

We disagree. Turner had reviewed the record and had heard the other parties' testimonies before giving her own, so Turner understood what efforts the agencies had made in this case. And Turner provided at least two primary reasons for her opinion: Mother's continued drug use and H.A.'s continuing special needs. And unlike ICWA's requirement for the district court's "serious emotional or physical damage" finding under 25 U.S.C. § 1912(f) (which specifically requires expert testimony), the court's "active efforts" determination did not require expert testimony under 25 U.S.C. § 1912(d). The district court could therefore find active efforts even without considering Turner's testimony. See 81 Fed. Reg. 38,778.

After reviewing all the evidence in the light most favorable to the State, we are convinced that a rational factfinder could have found it highly probable that the State used active efforts to reunite H.A. with Mother. *B.D.-Y.*, 286 Kan. 686, Syl. ¶ 4, 187 P.3d 594 (2008)—active efforts to involve the children's tribe and extended family members to assure that the children's Indian culture was protected and respected throughout the case, and active efforts to keep the family together and help Mother get the resources she needed. No more is required.

2. *Evidence Shows Beyond a Reasonable Doubt that Mother's Continued Custody of H.A. was Likely to Result in Serious Emotional or Physical Damage to H.A.*

Mother next argues that the district court lacked proof beyond a reasonable doubt that her continued custody of H.A. would result in H.A.'s serious emotional or physical

damage, as ICWA requires. Mother tacitly concedes that Turner was a qualified expert. She claims, however, that Turner ignored Mother's efforts to get sober and her other positive changes, such as providing negative UA's since January 2022 and a negative hair follicle test in March 2022, completing twelve parenting classes, securing a future job at McDonalds, and getting approved for housing assistance.

The State counters that the expert and the judge considered Mother's positive changes but were still convinced that failing to terminate Mother's parental rights would seriously damage H.A.'s emotional or physical state. We agree.

Turner was present at the termination hearing and thus heard the parties' evidence and knew the facts supporting Mother's claims that she had improved. And she was the director that oversaw the Indian Child Advocate, so she was familiar with H.A.'s file. Turner reviewed the record in this case and in H.A.'s previous CINC case before making her decision, and was thus aware of the facts for and against the State's argument that Mother's rights should be terminated. Contrary to Mother's assertion, expert Turner specifically acknowledged many of Mother's positive changes and congratulated Mother on her success. But despite that "snapshot in time," when Turner considered the entire case she was convinced that Mother's long history of drug abuse and her decision to surround herself with other drug abusers showed that Mother generally lacked the skills necessary to parent H.A. Turner also found Mother's actions conflicted with the Comanche Nation's practice of honoring their children.

Turner's opinion finds support in the record. True, Mother made positive changes, but she waited over a year to do so, while H.A. remained in out-of-home placement. And other evidence established that Mother's sobriety was likely temporary. These include Mother's actions after the 2016 CINC case, the "guarded" expectations noted in City on a Hill's discharge forms, and Mother's pattern of relapse after sobriety that concerned Lyman and Turner.

21

Additionally, the district court correctly found that H.A.'s specific needs stemming from her autism diagnosis supported the decision to terminate. Expert Turner confirmed that H.A's case was special because of her autism—she would continue to need a higher level of care. The record shows that H.A. struggled with communication, hygiene, and appropriate behavior. For example, although H.A. began menstruating, she did not understand what was happening or how to deal with it. She would touch herself and put blood on herself and others. She also exhibited inappropriate sexual behaviors at school and began regressing academically. Yet she improved when not in Mother and Father's care.

The record thus supports the district court's conclusion that evidence showed beyond a reasonable doubt that Mother's continued custody of H.A. was likely to result in serious emotional or physical damage to her. See, e.g., *In Interest of L.M.B.*, 54 Kan. App. 2d at 299 (upholding termination in ICWA case in which parents showed some progress in case plans but waited a year and a half to begin efforts); *In re J.F.S.*, No. 95,846, 2006 WL 2938567, at *3 (Kan. App. 2006) (unpublished opinion) (finding that harm was likely to occur based on witnesses' expressions of concern that the children could be harmed if mother ever stopped taking her medication or going to therapy coupled with evidence of mother's previous physical abuse of children); *In re B.T.*, No. 73,773, 1995 WL 18253741, at *4 (Kan. App. 1995) (unpublished opinion) (finding that physical harm was likely to occur based on father's conviction for attempted abuse, mother's fragile psychiatric state, and stress of raising a child with special needs).

Affirmed.